## KAHLEN *v.* UNITED STATES (No. 448).[1]

1. "SUITABLE" DEFINED.
     In the tariff law "suitable" means actually, practically, and commercially fit.

2. ONIONSKIN PAPER NOT PRINTING PAPER.
     The rare and exceptional use of onionskin paper for printing purposes does not constitute it printing paper and it was dutiable as paper not specially provided for under paragraph 402, tariff act of 1897.

United States Court of Customs Appeals, October 12, 1911.

APPEAL from Board of United States General Appraisers, Abstract 23721 (T. D. 30800).

[Affirmed.]

*Curie, Smith & Maxwell* (*W. Wickham Smith* and *Thomas M. Lane* of counsel) for appellants.

*D. Frank Lloyd,* Assistant Attorney General (*Thomas J. Doherty* on the brief), for the United States.

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

SMITH, Judge, delivered the opinion of the court:

The collector of customs at the port of New York classified an importation of glazed paper as paper not specially provided for and

---

1 Reported in T. D. 31947 (21 Treas. Dec., 381).

assessed it for duty at 25 per cent ad valorem under the provisions of paragraph 402 of the tariff act of July 24, 1897, the material parts of which paragraph read as follows:

402. Paper hangings and paper for screens or fireboards, and all other paper not specially provided for in this act, twenty-five per centum ad valorem; * * *.

The importer claimed that the merchandise was printing paper suitable for books and protested that as such printing paper the goods were dutiable at 15 per cent as valorem under the provisions of paragraph 396 of said act, the material parts of which are as follows:

396. Printing paper, unsized, sized, or glued, suitable for books and newspapers, * * * valued above five cents per pound, fifteen per centum ad valorem; * * *.

The Board of General Appraisers overruled the protest and the importer appealed.

On the hearing the importer sought to establish by seven dealers in paper, two dealers in book paper, three printers, and one dealer in printer's ink that the paper was suitable for printing books. The testimony of these witnesses was to the effect that judging from the appearance and finish of the paper, it could be printed on and that therefore it could be used and was a suitable paper for printing books. One of the witnesses had seen it used for printing a special edition of the bible, and one knew that it was sometimes used for printing circulars and drug catalogues. The importer himself stated that he had caused books to be printed on the paper in order to demonstrate that it could be used for that purpose. It further appeared from the testimony offered by the importer that the paper in question is variously known to the trade as manifolding paper, printing paper, or wrapping paper, and that it is used for the purposes indicated by those several names. The importer stated that it was also known to the trade as onionskin paper. All of the witnesses agreed that there are but few papers which can not be used for printing, and that most any paper can be printed upon if a suitable ink is employed. One of the witnesses stated that a book could be printed on almost anything in the paper line, and another that books had been printed even on blotting paper.

On the part of the Government, one importer and manufacturer of such paper as that imported, one importer and dealer of papers in general, and three printers testified that the merchandise was not paper suitable for the printing of books, and that although it might be printed upon it was not used by the trade as a printing paper save in exceptional cases. The manufacturers, importers, and dealers stated that the paper was known in the trade as onionskin or manifolding paper, that its introduction did away to a large extent with the old letter-press book, and that it was principally used as a manifolding typewriter paper for the making of carbon copies. The three printers testified that the paper was not suitable for the printing of

books, that it was sometimes used for printing circulars, billheads, letterheads, price lists, and matter where lightness of weight was desired, but that its principal use was that of manifolding paper for making carbon copies on the typewriter; that thin paper is sometimes used in the printing of bibles, but that such paper is generally heavier and less transparent than that which is in controversy. The examiners testified that from 1890 until the filing of the protests in this case in 1902 such paper as that imported had never been classified as printing paper and had always been returned for duty either as a writing paper or as a paper not specially provided for.

After a careful analysis of all the testimony in the case and an examination of the samples in evidence, we think the importer has failed to prove satisfactorily that the imported merchandise is either printing paper or that it is suitable for the printing of books. While the witnesses produced by him testified broadly that the paper in question was printing paper suitable for the printing of books, their statement in that behalf is nothing more than a conclusion drawn by them from the fact that it could be printed upon and that in some exceptional cases it had been actually utilized for the printing of books. Such evidence can hardly be accepted as satisfactory proof of the nature of the goods or their suitability for the purpose alleged, especially when it is considered that it appears from the testimony that almost any paper may serve a printing purpose and that even blotting paper has been used for printing books. From the fact that a thing may be used or has been used for a particular end it does not necessarily follow that it is commercially suitable therefor, and evidence of a casual, incidental, exceptional, or possible use of a thing can not be accepted as proof of its suitability for such use. A house may be built of ice or of paper, but in this country at least such materials would hardly be regarded as suitable building materials. A thing to be suitable, as that term is commonly understood, must be fit and appropriate for the end to which it is to be devoted. In the tariff law the term "suitable" means actually, practically, and commercially fit. The record in this case shows, substantially without contradiction, that onionskin or manifolding paper is principally used as a typewriter paper for the making of carbon or other copies, and that far from being recognized by the commercial world as a paper suitable for printing books its use for that purpose is so rare that out of the 17 witnesses produced by the Government and the importer on this subject only two ever saw or heard of books being printed on that kind of paper. If the paper in this case should be classified as printing paper suitable for books, there is no reason why blotting paper should not be classified in the same way.

Provision for paper suitable for the printing of books was first made in the tariff law of 1890 and has been continued in every act

since that year. The testimony of the examiners produced by the Government shows that from 1890 down to the date of the filing of the protest in this case paper such as that imported was never once assessed as printing paper suitable for books, which would seem to be confirmatory of the fact that the paper was never recognized by publishers or printers or by importers or dealers in paper as a printing paper commercially adapted to that use.

When Congress fixed a duty on printing paper suitable for books we can not believe that it contemplated the classification of any paper which might be printed upon as printing paper, or that the possible, rare, or exceptional use of a paper for the printing of books would be enough to determine its suitability for that purpose.

The decision of the Board of General Appraisers is *affirmed.*