JORDAN HARDWARE CORP. *v.* UNITED STATES [1]

United States Customs Court, Second Division

(Decided July 20, 1938)

*Strauss & Hedges* (*Howard C. Carter* of counsel) for the plaintiff.
*Joseph R. Jackson,* Assistant Attorney General (*Joseph E. Weil,* special attorney), for the defendant.

Before TILSON, KINCHELOE, and DALLINGER, Judges

DALLINGER, Judge: These are suits against the United States, arising at the port of New York, brought to recover certain customs duties alleged to have been improperly exacted on particular importations of bit stock drills and twist drills. Duty was levied thereon at the rate of 50 per centum ad valorem under the provision in paragraph 352 of the Tariff Act of 1930 for—

Twist and other drills * * * and metal-cutting tools of all descriptions, and cutting edges or parts for use in such tools, composed of steel or substitutes for steel, all the foregoing, if suitable for use in cutting metal, not specially provided for.

[1] O. D. 17.

It is claimed that said articles are properly dutiable at but 45 per centum ad valorem under the provision in paragraph 396 of said act for—

Drills (including breast drills), bits, gimlets, gimlet-bits * * * and other cutting tools * * * all the foregoing, if hand tools not provided for in paragraph 352, and parts thereof, wholly or in chief value of metal, not specially provided for;

or that said articles are properly dutiable at but 45 per centum ad valorem under paragraph 397 of said act as manufactures of metal not specially provided for.

The plaintiff offered in evidence a sample of the imported merchandise which was admitted as Exhibit 1; a bit brace for holding Exhibit 1 which was admitted as Illustrative Exhibit A; and a piece of copper which was admitted as Illustrative Exhibit B.

In addition to said exhibits, the plaintiff corporation called as a witness its president, Theodore M. Gillert, who identified Exhibit 1 as being representative of the imported merchandise. He testified that the only difference in the various drills in controversy was in the size and in the shape of the shank, the latter being made to fit the particular brace in which it was intended for use; that one of these drills is inserted in a bit brace similar to that represented by Illustrative Exhibit A, the jaw of which is made to clamp the bit so as to hold the drill firmly in place during operation; and that none of the drills is ever used by itself but always in connection with a bit brace for the purpose of drilling holes.

On cross-examination the witness testified as follows:

X Q. Is Exhibit 1 used to cut metal or wood?—A. I would say wood because these drills are not high speed, not high speed stock. They are not tough enough to cut metal.

X Q. You say you could not cut metal with a drill similar to Exhibit 1?—A. If the stock is of a high speed nature, I would say yes, but this is carbon stock. It is not high speed.

X Q. That is this particular drill. Do I understand your answer to be that this cannot cut metal? My question was whether or not this can cut metal.—A. You might try.

Mr. WEIL. I respectfully submit that the answer is not responsive, and I move that it be stricken.

Judge DALLINGER. Strike it out. Can that be used to cut metal? If you don't know, say so.

The WITNESS. No; I don't know. I am not sure.

By Mr. WEIL:

X Q. You say then it can only cut wood?—A. I am sure of that.

X Q. But you are not sure whether or not it will cut metal?—A. No; I am not.

\* \* \* \* \* \* \*

X Q. * * * Have you ever seen merchandise similar to Exhibit 1 used to cut metal?—A. I have.

\* \* \* \* \* \* \*

X Q. With your experience, would you be in a position to say that merchandise similar to Exhibit 1 is used to cut metal or wood?—A. I would say that particular drill is for wood.

X Q. For wood only?—A. That is right.

X Q. Now, what is the distinguishing feature that motivates or causes you to say that in your opinion that particular drill, referring to Exhibit 1, would be used on wood only?—A. I would say that for the simple reason I do not believe that this drill contains the necessary material to cut metal. It is not tough enough to use it on metal.

\*      \*      \*      \*      \*      \*      \*

X Q. You have seen twist drills used on metal?—A. Yes.

X Q. You predicate your opinion that this particular drill is only adaptable for use on wood upon the fact you do not think its composition is strong enough; is that correct?—A. That is correct, simply because we never bought high speed stock.

Mr. WEIL. I move that the answer be stricken as not responsive.

Judge DALLINGER. Motion denied. It may stand.

Mr. WEIL. Exception.

\*      \*      \*      \*      \*      \*      \*

Judge KINCHELOE. In the hardware trade of this country if you order bit stock drills to be used for drilling on wood, or for drilling on metal, there is certainly difference in them, whether they are for one purpose or the other, isn't that so? They are not all the same.

The WITNESS. Those used on metal are more expensive than these as a rule.

Judge KINCHELOE. Those used for metal are of a much better grade of steel?

The WITNESS. They are, both in quality and dimensions. These are a cheap type.

Thus concluded the testimony taken at the first hearing held on October 11, 1937. The case was continued on motion of counsel for the Government to November 8, 1937, at which time the Government called two witnesses. The first, Joseph R. Weiss, a mechanical engineer connected with the College of the City of New York, testified that articles like Exhibit 1 are known as twist drills because of the spiral cut made by them.

At this juncture the witness was asked to demonstrate in open court how Exhibit 1 when fitted into Illustrative Exhibit A would function in drilling or cutting a hole in the piece of metal marked in evidence herein as Illustrative Exhibit B, which he did. In view of the contradictory nature of the testimony and the result of this demonstration in open court, as shown by Illustrative Exhibit B, it is almost impossible to determine whether these drills are suitable for cutting metal.

On cross-examination the witness testified as follows:

Cross-examination by Mr. CARTER:

\*      \*      \*      \*      \*      \*      \*

X Q. Have you tried to make a hole in a piece of metal with a knife, an ordinary knife?—A. Yes.

X Q. Have you tried it by putting it under a bit brace, or twist drill brace?—A. Yes.

X Q. Did you encounter more or less the same difficulty you did in trying to make a hole in that piece of metal, Illustrative Exhibit B?—A. Well, that would depend on the metal. Naturally, if you wanted to go through the metal it would be virtually impossible to do so. You might be able to punch it through. If you wanted it to go through soft metal, that would be possible.

X Q. Would you consider Illustrative Exhibit B soft metal?—A. I would say it is fairly soft.

On redirect examination he testified:

R. Q. This drill can be sharpened or honed?—A. Yes; ground.

R. Q. From your own inspection of it, would you say it is in a sharpened condition or is it dull?—A. I would say that it were dull.

R. Q. This particular twist drill has a peculiar shank; is that correct?—A. That is correct.

R. Q. Referring to Exhibit 1. Are the jaws or the jaw of Illustrative Exhibit A, as cut, of the same shape as the shank of Exhibit 1? That is not of the same shape, is it?—A. No.

R. Q. Are there braces with jaws similar to the shape of the shank of Exhibit 1?—A. Not exactly because they have to fit not only one particular type, but many. The different manufacturers do not taper all these exactly the same so you would not necessarily need to sell a product like that. * * *

*　　*　　*　　*　　*　　*　　*

R. Q. Do you know of any brace which has a jaw which is more adaptable to holding a shank similar to that of Exhibit 1, than the jaw of Illustrative Exhibit A?—A. Yes.

On re-redirect examination the witness testified as follows:

R. Q. Mr. Weiss, in all of the many times you have used Exhibit 1, or merchandise like Exhibit 1, you have found them suitable for cutting metal?—A. Yes.

Judge DALLINGER. Isn't it a fact in order to be able to use a twist drill on metal it must be constituted of harder metal; it must have more carbon?

The WITNESS. Your Honor, that depends on what metal you want to cut. If you want to cut brass or bronze, you would need necessarily to have a good deal of carbon.

Judge DALLINGER. You would have to have a much harder metal, with greater carbon, than you would need if you were going to cut a hole in wood?

The WITNESS. Not necessarily. It depends on the thickness and it depends on the speed at which the drill is rotating.

Judge DALLINGER. Isn't it a fact that twist drills used for working on metal are composed of harder steel than those used by carpenters for making holes in wood?

The WITNESS. Yes, sir. To answer your question directly, yes.

The Government also called as a witness William V. Bunting, United States examiner of merchandise at the port of New York for the past twenty-eight years. He testified that he had used drills like Exhibit 1 in a brace both on wood and on metal; that the chuck of Illustrative Exhibit A is not designed for the particular drill represented by Exhibit 1; that bits like Exhibit 1 are advertised as suitable for use both on wood and on metal; that a bit used only on wood is an auger bit of a radically different construction; that in his opinion the chief use of a drill like Exhibit 1 is in cutting solid wood, but that it is

continuously used for work on metal; that the particular drill represented by Exhibit 1 is dull and is of such a shape that the chuck of Illustrative Exhibit A cannot hold it firmly in place to enable it to operate efficiently; and that because of this it wiggles back and forth in the brace.

On cross-examination he testified that Exhibit 1 is broken as a result of being used with the bit brace (Illustrative Exhibit A) on the piece of metal (Illustrative Exhibit B); and that in his opinion from an examination of said brace it would appear that Exhibit 1 contains a considerable quantity of carbon.

The plaintiff herein claims that the drills in question are properly dutiable either under paragraph 396 or 397. Inasmuch, however, as the collector's classification is presumed to be correct, the burden rested upon the plaintiff to prove by a preponderance of the evidence that said classification is erroneous and that the drills are not suitable for cutting metal. If they are suitable for cutting metal they are by the express terms of paragraph 396 excluded therefrom.

Upon the entire record we are of the opinion that the plaintiff has failed to sustain this burden. The testimony of the plaintiff's own witnesses is so contradictory that it is of little probative value. Moreover, the demonstration in open court is equally unsatisfactory and under the circumstances can scarcely be deemed a fair test, due to the dullness of the drill used and the fact that it did not fit the brace. The testimony of Examiner Bunting, who has had long experience in passing merchandise similar to that here involved, is clear and convincing to the effect that these drills are suitable for use in cutting both metal and hard wood. The fact that they are chiefly used for cutting wood does not remove them from paragraph 352. To exclude them from the latter paragraph the imported drill must be shown not to be "suitable for use in cutting metal."

In *United States* v. *Lorsch & Co.*, 8 Ct. Cust. Appls. 109, T. D. 37222, it was held that the expression "suitable for use" does not imply or require chief use. In that case, which arose under the Tariff Act of 1913, the appellate court reversed this court (then the Board of General Appraisers) and said:

The majority opinion held that "suitable for use" in a tariff sense means "chiefly used." The Government appeals. The majority opinion of the board is predicated upon the reasoning and authorities applicable to "use" where that term is employed generally and simply without any qualifying phrase or word. The well-settled rule in such cases, based upon a long and consistent line of decisions, was announced by this court, and approved in United States v. Irwin & Co. (7 Ct. Cust. Appls., 360; T. D. 36906) and Brown & Co. v. United States (7 Ct. Cust. Appls., 309; T. D. 36871), in United States v. Boker & Co. (6 Ct. Cust. Appls., 243; T. D. 35472), as follows:

All these considerations imply and necessitate that the *use* of the implement must determine its classification whether or not an agricultural implement within the paragraph, and that that use, and the determinative fact, is *chief use.*

\* \* \* \* \* \* \*

The adoption of "use" as the test of the application of paragraph 356, in the quoted particular, is not unqualified, but is limited or qualified to *susceptibility for the use therein expressed.* This, and all previous tariff acts, abound with instances wherein "use" is made the criterion of applicability in different degrees or subject to different qualifications or limitations. Such terms as "chief use," "suitable for use," "expressly for use," "such as is used," "for use as," "solely for use as," "fit only for," and other similar expressions are familiar terms in tariff adjudication. Each is given its own peculiar sphere of influence in tariff classification. Presumptively this difference of words imports a different meaning, and so the adjudications are.

The term immediately before us was before this court and interpreted in Kahlen v. United States (2 Ct. Cust. Appls., 206; T. D. 31947), wherein we said: "In the tariff law the term *'suitable' means actually, practically, and commercially fit."* See also Mamluck & Co. et al. v. United States (6 Ct. Cust. Appls., 556, 561; T. D. 36198). The rule to the same effect was announced by the Supreme Court. In the case of Chew Hing Lung v. Wise (176 U. S., 156), the United States Supreme Court, in considering the question whether or not tapioca was "fit for use as starch" within that language as used in paragraph 323 of the act of 1890, said:

We think the language of the paragraph means any preparation which is so far fit for use as starch as to be *commonly used* or *known* as such *or as a substitute therefor,* \* \* \* and \* \* \* the article here in controversy does not and can not compete with American starch for any of the purposes for which starch is *commonly and ordinarily* used in this country.

"Actually," or "practically," or "commercially," or "commonly," fit for or used as, in no sense imply or require chief use. Though, of course, as said by this court in French Import Co. et al. v. United States (7 Ct. Cust. Appls., 460; T. D. 37048), chief use necessarily implies a common and, therefore, a suitability of use.

Upon all the facts and the law we therefore hold that the plaintiff has failed to sustain the burden of proving that the collector's classification is erroneous. All claims are therefore overruled and the decision of the collector is affirmed. Judgment will be rendered accordingly.