CORRIGAN DISPATCH CO., a/c S.
Riekes and Sons et al.

v.

**UNITED STATES.**

C.D. 2899; Protest Nos. 62/3719–4058.

United States Customs Court,
First Division.

Feb. 23, 1967.

Stein & Shostak, Los Angeles, Cal. (Marjorie M. Shostak, Los Angeles, Cal., of counsel), for plaintiffs.

Barefoot Sanders, Asst. Atty. Gen. (Sheila N. Ziff and Alfred A. Taylor, Jr.,

New York City, Trial Attys.), for defendant.

Before OLIVER, WATSON and RAO, Judges.

OLIVER, Judge:

The consolidated protests in this case cover merchandise described as unfilled glass candle jars. In their imported condition, they consist of clear coneshaped containers of approximately 9 inches in length with the middle portion bulging out to a diameter of from 3 to 4 inches, narrowing at the top to an opening of about 2 inches and tapering to a point at the bottom. They were assessed with duty as blown glass household articles at the rate of 50 per centum ad valorem under the provisions of paragraph 218 (f) of the Tariff Act of 1930, as modified by T.D. 51802.[1]

Plaintiffs primarily contend that the merchandise is properly classifiable as jars, wholly or in chief value of glass, unfilled, suitable for use and of the character ordinarily employed for the holding or transportation of merchandise, dutiable at the rate of ½ cent per pound under paragraph 217 of the act, as modified by T.D. 51802, on entries made prior to July 1, 1962, and at 0.45 cent per pound under the same paragraph, as modified by T.D. 55615, on entries made thereafter.

In the alternative, plaintiffs claim the jars are properly dutiable as illuminating articles, wholly or in chief value of glass for use in connection with artificial illumination, other, at the rate of 30 per centum ad valorem under paragraph 218 (c) of said act, as modified by T.D. 51802, on entries made on or prior to June 30, 1962, and at 27 per centum ad valorem under the same paragraph, as modified by T.D. 55615, on entries made on or after July 1, 1962.

The involved provisions of the law are set forth as follows:

Paragraph 218(f) of the Tariff Act of 1930, as modified by T.D. 51802:

Table and kitchen articles and utensils, and all articles of every description not specially provided for, composed wholly or in chief value of glass, blown or partly blown in the mold or otherwise, or colored, cut, engraved, etched, frosted, gilded, ground (* * *), painted, printed in any manner, sandblasted, silvered, stained, or decorated or ornamented in any manner, whether filled or unfilled, or whether their contents be dutiable or free (except articles primarily designed for ornamental purposes, decorated chiefly by engraving and valued at not less than $8 each):

\* \* \* \* \*

Other ......50¢ on each article or utensils, but not less than 30% nor more than 50% ad val.

Paragraph 217 of the Tariff Act of 1930, as modified by T.D. 51802 and T.D. 51898:

Bottles, jars, and covered or uncovered demijohns, and carboys, any of the foregoing, wholly or in chief value of glass, if unfilled and holding more than one pint, not specially provided for .............½¢ per lb.

Paragraph 217 of the Tariff Act of 1930, as modified by T.D. 55615 and T.D. 55649:

Bottles, vials, jars, ampoules, and covered or uncovered demijohns, and carboys, any of the foregoing, wholly or in chief value of glass, not specially provided for, if unfilled and holding over 1 pint ....0.45¢ per lb.

As originally enacted, paragraph 217 contains the following proviso and it is

---

1. Via subsequent trade agreement modifications (T.D. 53865 and T.D. 53877) the residuary clause in paragraph 218(f) was reduced in duty to 30 per centum ad valorem leaving the category of table, kitchen (articles or utensils) and household articles, among other special categories not here involved, at the 50 per centum level.

applicable to all merchandise claimed thereunder:

> *Provided*, That the terms "bottles," "vials," "jars," "ampoules," "demi-johns," and "carboys," as used herein, shall be restricted to such articles when suitable for use and of the character ordinarily employed for the holding or transportation of merchandise, and not as appliances or implements in chemical or other operations, and shall not include bottles for table service and thermostatic bottles.

Paragraph 218(c) of the Tariff Act of 1930, as modified by T.D. 51802 and T.D. 51898:

> Illuminating articles of every description, finished or unfinished, wholly or in chief value of glass, for use in connection with artificial illumination:
>
> Prisms, glass chande-
> liers, and articles
> in chief value of
> prisms ............30% ad val.
> Globes and shades .....45% ad val.
> Other (not including
> chimneys) ..........30% ad val.

Paragraph 218(c) of the Tariff Act of 1930, as modified by T.D. 55615 and T.D. 55649:

> Illuminating articles of every description, finished or unfinished, wholly or in chief value of glass, for use in connection with artificial illumination:
>
> \*        \*        \*        \*        \*
>
> Other (not including
> chimneys) ..........27% ad val.

At trial, plaintiffs called three witnesses and introduced 11 exhibits into the record. An official sample of the importations at bar was received into evidence and marked plaintiffs' exhibit 1.

Mr. Charles Brenner, plaintiffs' first witness, testified that he was in charge of the production and distribution of glassware imported from Mexico for S. Riekes & Sons, one of the plaintiffs and the actual importer herein. He identified S. Riekes & Sons as "mostly distributors in the container and glassware areas of the United States and Canada," dealing mainly in glass household and table wares produced domestically or imported from Mexico. The company maintains showrooms in Dallas, Atlanta, New York City, San Francisco, Los Angeles, and Omaha. The witness had been associated with the glass industry since 1940 and had personally dealt with many of the larger domestic producers of all types of glassware products, including flower vases and candleholders.

Referring to exhibit 1, Brenner stated that it was manufactured in Monterrey, Mexico, through his firm according to the design of, and sold exclusively to, the Reed Candle Co. of San Antonio, Tex. for use as candle wax containers. It was his opinion that the imported candle jars were unlike any other item handled by his company in design and shape and that they were not similar to any flower holders he had seen on the market. He testified that his company is presently manufacturing a bud vase without a foot but that they were specially designed for flowers, had a flaired or decorative finish, and measured only 1½ inches in overall diameter.

Plaintiffs' second witness, Mr. Henry A. Reed, was identified as the executive vice president in charge of sales for the Reed Candle Co. of San Antonio, Tex. He testified that the Reed Candle Co. manufactures and sells candles to three main markets: the grocery business, buyers of anything from household to devotional candles; the institutional trade; and the giftware trade. However, the imported items in this case, which were designed by Reed for use as candle containers, are sold exclusively throughout the United States to institutional buyers such as cafes, restaurants, and hotels. They are not offered to any other market. Effective control of this restriction is maintained by the Reed Company since it ships the merchandise directly to the end user on orders received from the John Sexton Co., the only institutional wholesaler with which it deals.

With respect to the design of the jars, the witness stated that it resulted from

experimentations with various sizes and shapes in order to meet the requirements of the institutional trade. A minimum burning time of 140 hours is one such requirement and to achieve this the exact diameter of the container must be strictly adhered to by the manufacturer. The opening or mouth of the jar is further designed to allow a proper amount of oxygen to enter while at the same time permitting the right amount of carbon exhaust to escape without causing adverse smoking conditions or odor. Each jar is also specifically designed for use with two types of "fixtures" or holders (plaintiffs' exhibits 2 and 3). The holders are likewise sold only to institutional users and a sufficient quantity usually accompanies the initial order of candles.

Exhibits 4 and 5 were offered in evidence as representative samples of the candle jars subsequent to the application of color. Reed explained that the jars in their imported condition (exhibit 1) are always subjected to a complicated coloring and firing process before they are ready for the wax filling department. Exhibit 6 represents the colored jar filled with wax as it is offered to the institutional trade. Plaintiffs' exhibits 7 and 8 were also received in evidence as samples of the marketed items containing the monograms or trade marks of particular customers.[2] This type of tailored merchandise represents a small percentage of the overall volume, amounting to 2 or 3 orders per day compared with the 50 to 60 orders distributed each day.

Reed further testified that he had on many occasions observed the candle jars in use on restaurant tables furnishing candlelight during dinner hours. They are generally arranged one to a table. He also testified from his own knowledge that the jars are thrown away after the wax is consumed. His company does not sell the wax without the jars, it being more economical for the users to simply reorder the entire item. When questioned concerning his experience with the giftware industry, he stated that he had never seen a similarly shaped item sold as a candle or flower holder for household consumption.

On cross-examination, the witness reiterated that he had never seen similarly designed articles sold at retail and that the shape of the instant merchandise was based solely upon his company's endeavors to achieve an item that would burn in its particular fixtures. He declined to agree that the decorative appearance of the items was their main attraction stating that the proper burning length and their use as candle lights were the principal features in dealing with the institutional trade.

On redirect examination, the following questions and answers appear:

Q. And when you testified that it is used in the institutional trade for candle light, is that for illumination?— A. Definitely.

Q. Is it the only illumination in the uses that you have observed?—A. No, generally there is other light. The light this gives is not enough, but it does play an integral part. Generally the places, they have rheostats that control the light, and without the candle it is not enough light, but it isn't the only light. They have to spot it with other light, but it is the illumination of the candle that the institutional buyer is buying. They are not buying a glass for a container.

Plaintiffs further offered into evidence an instrument used for lighting and relighting the candle jars and some descriptive literature explaining its use (exhibits 9 and 10). Both items are distributed with the candle jars to the institutional users.

Once again on re-cross-examination, the witness maintained that the use of the candle light illumination was the most important aspect of the article.

Plaintiffs' final witness was Mr. Thomas H. Butler, former salesman, district sales manager and presently gen-

2. Exhibit 7 reads "The Steak House, Myrtle Beach, S. C." and exhibit 8 reads "The Governor Tryon Motor Inn, New Bern, North Carolina."

eral manager of the southwest for John Sexton & Co., the exclusive distributors of the finished candle jar items (plaintiffs' exhibit 6). He described his firm as institutional wholesale grocers selling only to restaurants, hotels, country clubs, schools, and the like. He testified that he had personally sold and supervised sales of the candle jars since their inception into this country. He had personally visited other branch offices throughout the country and knew the sales practices were the same. His testimony generally corroborated that given by the previous witness with respect to how the merchandise was sold, to whom, and for what purpose. His salesmen try to supply a customer with a sufficient stock to last during intervals of up to 30 days to 6 weeks. Plaintiffs' exhibit 11 was received in evidence as the carton packaging unit that supports the candle jars in shipment.

Mr. Reed was recalled briefly to state that due to the large diameter of the candle and more especially to the low melting point of the wax, the candles could not be shipped or stand in storage without their glass containers.

The collector's classification of the instant merchandise as blown glass household articles carries with it the presumed finding of fact that they are chiefly used in or about the environs of the home. M. Pressner & Co. v. United States, 49 Cust.Ct. 221, Abstract 67019; Ace Importing Co., Inc. v. United States, 44 Cust.Ct. 468, Abstract 64185. There can be no doubt that the uncontradicted evidence presented in this case conclusively establishes that the imported items are used in places other than the household, namely, restaurants, hotels, and the like. The weight of the evidence further indicates that the factors of size and shape incorporated into the design of these articles render them dissimilar to glass containers offered to the gift and retail trades. On the basis of such evidence, we find the collector's classification to have been successfully rebutted and the presumption attending that classification overcome. It remains for the plaintiffs to show a factual and legal situation to support one of their claims. United States v. Magnus, Mabee & Reynard, Inc., 39 CCPA 1, C.A.D. 455.

The primary claim put forth by the plaintiffs is that the imported articles represent unfilled glass jars, suitable for use and of the character ordinarily employed for the holding and transportation of merchandise within the meaning of paragraph 217, as modified. The case of Will & Baumer Candle Co., Inc. v. United States, 37 CCPA 27, C.A.D. 414, is cited as controlling authority on a similar set of facts. The *Will & Baumer* case involved certain merchandise consisting of open-end glass containers, imported empty, and measuring 9½ inches in height and 2¼ inches in diameter. The evidence showed that they were designed and used to hold candles or candle wax and that, after being filled, they were sold as units for sanctuary lamps to churches and similar institutions throughout the United States. A majority of this court had overruled the protest claim under paragraph 217 without affirming the collector's classification as decorated glassware under paragraph 218 (f), noting in part that

> * * * All glass jars used to ship merchandise do not thereby automatically become such as are *ordinarily* employed for such purpose. To fall within paragraph 217, the articles must be not only suitable for use for the holding or transportation of merchandise, but must also be of the character ordinarily employed for such purpose. [Emphasis quoted.]

On appeal, the Government acquiesced in the trial court's non-approval of the collector's classification and so the sole question presented was the applicability of the provisions of paragraph 217 to the imported merchandise. In reversing the decision below, the court of appeals expressed disagreement with this court's interpretation of the meaning "ordinarily employed" as contained in the proviso in paragraph 217. Recognizing that the containers held and transported candles or "merchandise," and that they were

certainly suitable for such use, the court concluded:

> We do not think that in order to fall within the meaning of the phraseology of the proviso the containers are required to be of a kind suitable to be used and ordinarily used in holding or transporting *all kinds* of candles. Where a special type of such merchandise exists and a specially designed container is made and used for holding or transporting it, we think the requirement of the statute is met, provided, of course, the container meets the statutory requirements in other respects.

█ Although there are many points of similarity between the situation described in the *Will & Baumer* case, supra, and that presented in the instant case, there is at least one important respect in which the involved merchandise fails to meet the requirements of paragraph 217 and that is on the issue of suitability for use. It has long been the law that for merchandise to be considered suitable for use it must be actually, practically, and commercially fit for the use described. Kahlen v. United States, 2 Ct. Cust.App. 206, T.D. 31947. As stated by that court, "A thing to be suitable, as that term is commonly understood, must be fit and appropriate for the end to which it is to be devoted." Moreover, this commercial suitability or fitness applies to the merchandise in its imported condition. United States v. Lorsch & Co., 8 Ct.Cust.App. 109, T.D. 37222; Klipstein v. United States, 1 Ct.Cust.App. 122, T.D. 31120; Bluefries New York, Inc. v. United States, 40 Cust.Ct. 395, C.D. 2010. These judicial pronouncements have been consistently followed in decisions rendered under the 1930 Tariff Act. United States v. Geo. S. Bush & Co., Inc., et al., 26 CCPA 145, C.A.D. 8; Coro, Inc. v. United States, 41 CCPA 215, C.A.D. 554.

According to the testimony of plaintiffs' main witness, Mr. Henry Reed, the imported articles are never filled with candle wax in their imported condition.

Necessary and significant preliminary steps are taken before the containers are ready to hold and transport their wax contents. This is revealed from the following exchange during trial:

> Q. Does the Reed Candle Company sell the candle jar, which is Plaintiffs' Exhibit 1, in its condition as imported? —A. No.

> Q. What does Reed Candle Company do with that article?—A. Before this article is *appropriate* for the institutional trade, we first must color it, and this is quite a complicated process. We use an epoxy resin. I don't want to divulge the way we apply this, because those are trade secrets. After it is applied, and a certain amount of air is blown into it, then we fire it. We bake it. After it is baked, then we send it to our filling department.

> Q. Did you bring with you any samples of articles like Plaintiffs' Exhibit 1 which have been colored, as you use them in your business?—A. Yes, I brought them in the different stages.

> Q. I show you two additional samples of the articles—And ask you if these two candle jars indicate the painted condition that you just described?—A. Yes. Of course, we don't call it painted condition. It is an application inside. This will not be attacked by the wax. It resists many chemical reactions. [Emphasis supplied.]

Again, referring to the fired-on coloring process, Reed testified that "The wax will not attack it. It is playing its part as a container."

█ Unlike the situation presented to the court in the *Will & Baumer* case, supra, the imported articles in this case are not appropriate or commercially fit, upon importation, to hold or transport the merchandise they were exclusively designed to carry; further manufacturing is required. The applicable provision in paragraph 217 calls for "jars * * * suitable for use * * * for the holding or transportation of merchandise, * * *" and not articles dedicated for use in the

manufacture of jars for the holding or transportation of merchandise. Plaintiffs' claim for classification within paragraph 217 is, therefore, untenable.

Under their alternative claim for classification as illuminating articles within paragraph 218(c), plaintiffs argue that the evidence adduced herein establishes that the imported articles, after being further processed and filled with wax in the United States, are used by the institutional trade in restaurants, cafes, and so on, during evening hours and in connection with artificial illumination, to supplement other lighting and create an ornamental effect.

We find a great deal of merit in this claim both in terms of the facts presented and the law applicable to those facts. Plaintiffs' witness Reed, the designer of the imports and a man most familiar with their marketable uses, consistently testified on a series of direct and cross-examinations that the primary use of the end products (plaintiffs' exhibit 6) was to furnish the illumination required by the institutional purchasers. Moreover, the illumination served first the practical purpose of affording necessary light for dining, and secondly, it furnished an ornamental decor.

The leading and most oft-cited authority on the scope of the provision for illuminating articles is the case of Solomon & Son v. United States, 13 Ct.Cust. App. 353, T.D. 41256. In passing upon similar language in the Tariff Act of 1922, the court of appeals made the following observation:

> * * * It is perfectly obvious from the language of the provisions that it was intended by Congress to include within the scope of the paragraph all illuminating articles used in connection with artificial illumination whether decorative or merely practical. The articles mentioned in the paragraph are not such as generate light; they but disperse the rays of light to give the desired illuminating effect. Therefore they are for use in *connection with*

artificial illumination. [Emphasis quoted.]

and it applied the following test:

> * * * We do not believe that the character, degree, or extent of illumination furnished by an article is a proper test under the statute, if it is chiefly used in connection with artificial illumination and in such manner as to pass, reflect, refract, disperse, color, or otherwise affect the light for either practical or ornamental illuminating purposes.

The Government has sought to argue that the imported items, which are subject to further processing in this country, are not, in their imported condition, illuminating articles within paragraph 218 (c), and further, that their illumination is of only a minor and incidental amount and, therefore, they are additionally excluded from the scope of paragraph 218 (c) under the authority of United States v. General Display Case Co., Inc., 21 CCPA 542, T.D. 46976.

In the first place, paragraph 218(c) by its own terms applies to "unfinished" illuminating articles and this has been explicitly held to cover articles finished in this country. United States v. Horni Signal Mfg. Co., Inc., 27 CCPA 316, C.A. D. 106. In the second place the facts before the court in the *General Display* case, supra, established that the chief use of the imported articles was for advertising purposes and that they were specially constructed for such purposes. It held that the illumination provided was minor and incidental vis-a-vis that chief use. No comparable situation is before us here. The facts of the matter are these: That the imported articles were carefully designed and further processed to primarily act as containers for burning candles; that the lighted candles provide artificial illumination; and that the articles are used in such a manner as to pass and color the light for both practical and ornamental illuminating purposes.

Whether paragraph 217 more specifically provides for the merchandise at bar than does paragraph 218(c)—the final

argument set forth in plaintiffs' brief— has become a moot question due to our position respecting plaintiffs' primary claim. Nevertheless, in contending for the relative specificity of paragraph 217, plaintiffs have made the unnecessary[3] and unpersuasive argument that the principal or chief use of the imported jars is in holding and transporting the candles, citing the *Will & Baumer* case, supra, as relevant authority. As was pointed out, supra, the sole question in that case was whether the articles were described within paragraph 217 and the issue of principal or chief use was not raised or determined. A decision holding articles suitable for a certain use does not imply or require a finding of chief use. United States v. Lorsch & Co., supra. Furthermore, the testimony of plaintiffs' own witnesses in this case concerning the construction and use of the imported merchandise is inapposite to the position advanced by plaintiffs in this argument, namely, that their principal function was to hold and transport merchandise. As was said by the witness Reed at trial, "They [the institutional buyer] are not buying a glass for a container."

The presumption of correctness of the collector's classification, is of course, limited to the specific classification made by him, and while the provisions of paragraph 218(f), as modified, supra, provide for articles other than household items, none is more descriptive of or applicable to the instant merchandise than the language of paragraph 218 (c). For all of the reasons discussed above and from the conclusions reached herein, we find and hold that the imported glass items are properly dutiable within paragraph 218(c), as modified, supra, as illuminating glass articles, unfinished, for use in connection with artificial illumination, the appropriate rate of duty

depending upon the date of importation. To the extent indicated the protests are sustained and judgment will be entered accordingly.

RAO, C. J., and WATSON, J., concur.

---

3. The doctrine of relative specificity operates only where an article is actually enumerated in two or more tariff provisions and it is used to determine which provision describes the article with the most certainty. An argument negating the factual and legal basis of one of the enumerations is not germane.