Therefore, it it ORDERED: Judgment is granted for defendant in this action.

---

LUKAS AMERICAN, INC. (FEDERATED EQUIPMENT CO.), PLAINTIFF *v.* UNITED STATES, DEFENDANT

Court No. 82-5-00736

Before RE, *Chief Judge.*

(Decided May 24, 1984)

Mandel and Grunfeld (*Steven P. Florsheim* and *Robert B. Silverman* at the trial and on the brief), for the plaintiff.
*Richard K. Willard,* Acting Assistant Attorney General; *Joseph I. Liebman,* Attorney in Charge, International Trade Field Office, Commercial Litigation Branch (*Kenneth N. Wolf* at the trial and on the brief) for the defendant.

RE, *Chief Judge:* The question presented in this case pertains to the proper classification, for customs duty purposes, of certain merchandise imported from West Germany, and described on the customs invoice as "Lukas Cutters and Spreaders."

The Cutters are composed of sharp metal blades which are driven by hydraulic pressure, and can be used to cut almost everything except rock. The Spreaders, driven by the same hydraulic system, are also of metal, and, when used in conjunction with metal chains, can be used to separate, lift, crush, bend or pull nearly every type of substance. The purpose of these two articles, when used with other components, is to free victims who are

trapped in an automobile as a result of an accident. In essence, the cutters and spreaders perform this function by the destruction of any object which prevents the removal of a victim from the scene of an accident.

The merchandise was classified by the Customs Service as "tools suitable for metal-working" under item 674.60 of the Tariff Schedules of the United States (TSUS). Consequently, it was assessed with duty at the rate of 7.1% ad valorem in 1980, and 6.8% ad valorem in 1981.

Plaintiff protests this classification, and contends that the merchandise is properly classifiable under item 674.70, TSUS, as tools "other" than those suitable for metalworking. Hence, plaintiff maintains that the merchandise is properly dutiable at the rate of 4.3% ad valorem for 1980, and 4% ad valorem for 1981.

The pertinent statutory provisions of the tariff schedules are as follows:

*Classified under:*
> Schedule 6, Part 4, Subpart F:
> > Hand-directed or -controlled tools with pneumatic or self-contained non-electric motor, and parts thereof:

| | | |
|---|---|---|
| 674.60 | Tools suitable for metal-working and parts thereof. | 7.1% ad val. (1980) |
| | | 6.8% ad val. (1981) |

*Claimed by plaintiff under:*
> Schedule 6, Part 4, Subpart F:
> > Hand-directed or -controlled tools with pneumatic or self-contained non-electric motor, and parts thereof:

| | | |
|---|---|---|
| 674.70 | Other............................................ | 4.3% ad val. (1980) |
| | | 4% ad val. (1981) |

The question presented is whether, within the meaning of the competing tariff provisions, the imported articles are dutiable as "tools suitable for metal-working," as classified by Customs, or as tools "other" than those suitable for metalworking, as claimed by plaintiff.

After an examination of the merchandise, relevant case law, lexicographic definitions, and the testimony of record, it is the determination of the court that plaintiff has overcome the presumption of correctness that attaches to the government's classification, and the protest is sustained. 28 U.S.C. 2639(a)(1) (1982). *See Jarvis Clark Co.* v. *United States,* No. 83–1106 (Fed. Cir. May 2, 1984).

At trial, plaintiff presented testimony to prove that the merchandise was designed for use in rescue operations, is particularly well-suited for use in rescue operations, is marketed exclusively for that purpose, and is not a metalworking tool. The testimony presented

by the defendant attempted to show that the tool was suitable for metalworking, and that it had a variety of uses aside from its application for rescue operations.

Mr. George R. Weigand, president of Lukas American, Inc., at the time of the disputed classification, testified as to the precise use of the "Lukas Rescue System." He stated that the Cutters are used to cut away any material that prevents the removal of a victim from a vehicle, and that the Spreaders are used to pry open doors, or separate any material that may prevent the removal of a victim from the scene of an accident.

Mr. Weigand further testified that he was also the company administrator, and that the marketing personnel reported directly to him. He testified that the Lukas tool was sold, together with other components, including an emergency standby pump, as a unit under the name "Lukas Rescue System." The components were not sold separate and apart. He stated that the firm's marketing strategy for the Lukas Rescue System was to target, exclusively, fire departments and rescue squads, through both trade journals and trade shows. To his recollection, only one sale (of approximately one thousand sales) had been made for non-rescue purposes, and, in that one, the merchandise was returned by the buyer because it did not perform the task for which the buyer had purchased it. While not controlling, it is well established that the marketing of an imported article is relevant in determining the proper classification of that item for tariff purposes. *See* cases cited in *Nomura (America) Corp.* v. *United States,* 299 F.Supp. 535, 542 (Cust. Ct. 1969).

On cross examination it was noted that certain brochures, used to market the Lukas tool, stated that the device was also capable of cutting metal tubes and cables, and other articles not usually found in automobiles. Mr. Weigand's testimony, however, made it crystal clear that these particular capabilities are necessary in certain automobile accident situations. For example, to help extricate an accident victim, it might be necesary to separate or cut the tubing of a "cyclone" fence, or to cut the tension cable of a highway guardrail.

Mr. Sanford Weinberg, president of Universal Fire Equipment Corporation and a former field service engineer at Bobst-Champlain, is also a volunteer fireman who has had ten years of field experience working with the Lukas tool as a rescue device. As a vendor of rescue equipment with Universal, Mr. Weinberg testified that, not only had he never sold a Lukas tool for any non-rescue application, but that he had never even attempted such a sale.

During his employment at Bobst-Champlain he was frequently called upon to operate machine tools, as well as metalworking tools. Although he stated that he had no expertise in the field of metalworking, he was nevertheless certain that the Lukas tool was not a metalworking tool because it destroys, rather than enhances the metal upon which it operates. He testified that the device did

not have a practical industrial application because it was too expensive, and was not designed for continual use.

Mr. Harold Esten, the manager of engineering at Hurst Performance, Inc., and an expert in metalworking, testified for the defendant that metalworking is "the process of changing the size or shape or material proportion of a metal towards some useful end." Mr. Esten stated that the mangling of a car door to free a trapped victim, or the separating of two cars is "metalworking." Hence, in his opinion, Lukas Cutters and Spreaders are metalworking tools.

Mr. Esten testified that the Lukas tool is "conceptually similar" to one marketed by Hurst, and that the Hurst tool has many other applications apart from its use in rescue operations. He also stated that the Hurst tool, like the Lukas tool, with which it competes, is usually sold as a package, but that Hurst also sells the components separately. He admitted, however, that the Hurst and Lukas tools are not identical, but "different," and that the Hurst tool uses a different hydraulic system. Mr. Esten also admitted that the Hurst tool is marketed as "[t]he only total rescue system," and that most of the marketing done by Hurst is directed to the rescue trade.

In order to decide the question presented the court must ascertain the precise meaning of the term "metalworking," as used by Congress in the tariff schedules. Judicial precedents teach that terms used in the tariff schedules are to be given their "commercial" or "common" meaning. Furthermore, in their interpretation, an authoritative source is Webster's *Third New International Dictionary of the English Language,* since it was published contemporaneously with the promulgation of the tariff schedules. *See Charles Scribner's Sons v. United States,* 574 F.Supp. 1058, 1062 (Ct. Int'l Trade 1983); *Air-Sea Forwarders, Inc. v. United States,* 76 Cust. Ct. 268, 271 (1976).

Webster defines metalworking as "the act or process of shaping things out of metal." Funk & Wagnall's *New Practical Standard Dictionary of the English Language* (1983), also an authoritative dictionary, defines the term as "the making or the business of making things out of metal."

In *United States v. Kurt Orban Co.,* 47 CCPA 28 (1959), the question presented pertained to the correct classification of a metal scrap baler. The main purpose of the baler was to take scrap metal and compact it into small bundles for ease of transportation and storage. The specific classification question was whether the metal scrap baler could properly be considered a machine tool. The baler had been classified by the Customs Service as a machine tool under paragraph 372 of the Tariff Act of 1930. The Customs Court held that it was not dutiable as a machine tool, but rather, as a machine, and sustained the importer's protest. The Court of Customs and Patent Appeals affirmed the Customs Court, and held that the baler was not a machine tool. Machine tools were, in part, described by the applicable statute as "any machine operating other

than by hand power which employs a tool for work on metal." *Id.* at 29. While not controlling, the case is instructive and its oft-quoted language is helpful here. In interpreting the statutory language, the court noted that:

> The word "work" is susceptible of such a wide variety of meaning[s] that we have grave doubts Congress intended it to be construed as broadly as the Government urges. For example, in a broad sense any tool which changes the shape, size, or even the position of a piece of metal in any manner and for any purpose may be literally said to do "work" on it, even though the nature of that particular "work" be wholly incidental to the primary function of the device. Under such circumstances there is a substantial doubt in our mind that Congress intended that word to be given such a broad construction, and we think it proper to resolve that doubt in favor of the importer. [Citations omitted.]

*Id.* at 30–31. The quoted observations indicate that although the Lukas Cutter may change the size, form and shape of metal, as well as other material, that capability is in no way its primary or essential purpose or function. Its purpose is clearly to perform as a rescue device.

It is not questioned that articles are normally to be classified under an appropriate *eo nomine* provision. It is also clear that use is not a criteria in determining whether merchandise is classifiable under an *eo nomine* designation. *Pistorino & Co.* v. *United States,* 599 F. 2d 440, 445 (CCPA 1979). Nevertheless, in order to establish the proper classification of an imported article, use may be considered to determine whether it is embraced within the *eo nomine* designation. See *United States* v. *Quon Quon Co.,* 46 CCPA 70, 72–73 (1959); *Sanji Kobata* v. *United States,* 326 F. Supp. 1397, 1401 (Cust. Ct. 1971).

In *Sanji Kobata,* oriental "byobu" folding screens had been classified by the Government as "wood screens" under TSUS 206.67. Plaintiffs claimed that they were "wall hangings" properly classifiable under TSUS 765.03 as "paintings." The evidence established that the articles were hand-painted, only decorated on one side, too small to function as partitions, and were specifically designed to be wall hangings. The evidence further established that the articles could serve no useful purpose other than as works of art. Indeed, the court found that "[i]t was not a utilitarian article of furniture, but an object of admiration and contemplation." *Id.* at 1406. The court, therefore, found that plaintiff's claimed classification was correct. Thus, the *Sanji Kobata* case indicates clearly that use may be of great importance in determining the identity of an article. *Id.* at 1401. *See also United States* v. *Quon Quon Co.,* at 73 (1959).

In the present case, although the Lukas Cutters and Spreaders may have the capacity to do some limited work upon metal, the testimony is irrefutable that their purpose, function, or use is in

rescue operations. They were neither designed, nor are they used to change the size or shape of "metal towards some useful end."

In *Mattoon & Co. v. United States,* 62 Cust. Ct. 291 (1969), the question pertained to the proper classification of pneumatic guns used to strip away paint, rust and other contaminants from a variety of surfaces, including metal. The imported tools were operated by driving a bundle of needles back and forth in rapid oscillation. When these needles "played" on a particular surface they would cause the desired stripping effect.

The Government classified the guns under TSUS 674.60, as "hand-directed or -controlled pneumatic tools suitable for metalworking, and parts thereof." The plaintiff claimed that the guns were properly classifiable under TSUS 674.70, as "other hand-directed or -controlled tools." The question presented, therefore, was whether these tools were suitable for metalworking. In holding that the guns were not "suitable for metalworking" under TSUS 674.60, the court stated: "[t]he term 'suitable' has been judicially determined to mean actually, practically and commercially fit for the use described. In a broad sense, the [gun] is 'suitable' for use on metal but whether such use would bring said article within the language for 'metalworking' is doubtful." *Id.* at 294 (citing *Kahlen v. United States,* 2 Ct. Cust. Appls. 206 (1911) and *Coro, Inc. v. United States,* 41 CCPA 215 (1954)).

In the *Mattoon* case, the court quoted extensively from the Summaries of Tariff Information, 1948, volume 3, part 4, and noted a distinction between machine tools and metalworking tools. Machine tools were found to be power-operated tools and workholding devices used for the purpose of progressively removing metal in the form of clips, whereas metalworking tools were designed specifically for shaping metal through bending, pressing, and similar processes. *Id.* at 295.

Similarly, in *Schmidt, Pritchard & Co. v. United States,* 77 Cust. Ct. 1 (1976), the court held that the imported merchandise, wire coiling equipment, was not a metalworking tool. This holding followed from the court's finding that the coiling of metal wire rods and bars, by the imported coiling device, neither enhanced nor improved the status of the rods or bars for subsequent use.

In the present case the defendant's witness, Mr. Esten, contrary to the holdings in *Mattoon* and *Kurt Orban,* testified that a metal scrap baler and a pneumatic stripping gun are "metalworking tools." Mr. Weigand testified that the Lukas tool was specifically designed to be light and portable for rescue operations, and that many heavy-duty components had to be replaced by lighter, less efficacious ones. All of the testimony left no doubt that the purpose, function or use of the system is clearly "to free trapped humans from cars involved in a traffic collision."

It is fundamental that the court must interpret statutes in a manner consistent with the intent of the legislature. In all cases, it

is the function of the court to give effect to the legislative purpose. Furthermore, it cannot be questioned that, in areas in which the Congress can speak with final authority, the court must strive to implement and fulfill the legislative will and to be faithful to the legislative purpose. *See generally Mount Washington Tanker Co.* v. *United States,* 505 F.Supp. 209, 212, 215–16 (Ct. Int'l Trade 1980). No evidence was presented that would indicate that the term "metalworking" was used in a special or extraordinary sense. Consequently, it should be given its commercial or ordinary meaning.

Plaintiff's witnesses were thoroughly familiar with the design, sale and use of the articles at issue. Their testimony, which was candid, credible and reliable, established beyond question that the Lukas Cutter is used for rescue operations. It is clearly not designed to shape metal, but rather, to rescue trapped accident victims by destroying any material that prevents their removal. Furthermore, plaintiff's unrefuted testimony established that the Lukas Cutter, because of its weight, design, and expense, was not commercially suitable for uses other than the intended rescue operations. Plaintiff's evidence indicated that only one Lukas tool had been sold for a non-rescue purpose. Defendant's witness, after stating that Hurst had sold between 15,000 to 20,000 of its product, could only point to a handful that had been sold or used for non-rescue purposes.

It is the determination of the court that the imported cutters and spreaders are not tools "suitable for metal working," within the meaning of item 674.60 of the tariff schedules, and that they were designed, constructed and used as rescue tools, legally classifiable under item 674.70 of the tariff schedules, as tools "other" than those suitable for metal working. Hence, they are dutiable at the rate of 4.3% ad valorem for 1980, and 4% ad valorem for 1981.

Since plaintiff has overcome the presumption of correctness and borne its burden of proof, plaintiff's claim is sustained. Judgment will issue accordingly.