(C.D. 4852)

RIEKES CRISA CORP., PLAINTIFF *v.* UNITED STATES, DEFENDANT

Consolidated Court No. 65/19461

(Decided April 3, 1980)

*Stein, Shostak, Shostak & O'Hara, Inc.* (*Majorie M. Shostak* at the trial and on the briefs) for the plaintiff.

*Alice Daniel,* Assistant Attorney General; *David M. Cohen,* Director, Customs Litigation Branch (*Edmund F. Schmidt* and *Bernard Babb* at the trial; *Edmund F. Schmidt* on the brief), for the defendant.

RE, Chief Judge: The question presented in this case pertains to the proper classification, for Customs duty purposes, of glass jars imported from Mexico. The glass jars are of three different styles known as the "Tiffany," the "Monterrey" or "Hurricane," and the "Parisian" or teardrop.

Ten of the fifteen consolidated protests include "Tiffany," "Monterrey" or "Hurricane," and "Parisian" or teardrop glass jars which were classified by the Customs officials under item 546.51 or 546.52 of the Tariff Schedules of the United States (TSUS) depending upon the date of entry, as other glassware household articles, not specially provided for. Consequently, they were assessed with duty at the rate of 50 per centum ad valorem.

The remaining five protests include only "Parisian" or teardrop jars which were classified under item 548.05, TSUS, as other articles of glass, not specially provided for. Hence, they were assessed with duty at the rate of 25, 22, or 20 per centum ad valorem depending upon the date of entry. At the commencement of trial, the defendant asserted that these "Parisian" or teardrop jars were erroneously classified under item 548.05, TSUS, and that the proper classification should be under item 546.51 or 546.52, TSUS, at the rate of 50 per centum ad valorem.

Plaintiff's primary claim is that all of the imported glass jars are properly classifiable as other containers of glass chiefly used for the packing, transporting, or marketing of merchandise, holding over 1 pint, under the provisions of item 545.27, TSUS. Hence, all three styles of the glass jars should properly be assessed with duty at the rate of 0.4, 0.35, or 0.3 cent per pound depending upon the date of entry.

In the alternative, plaintiff contends that if its primary claim is not sustained, the "Tiffany," the "Monterrey" or "Hurricane," and the "Parisian" or teardrop jars of the 10 protests are properly classifiable under item 548.05, TSUS, as other articles of glass, not specially provided for, dutiable at the rate of 25, 22, or 20 per centum ad valorem depending upon the date of entry.

Plaintiff makes no alternative claim as to those "Parisian" or teardrop jars of the remaining five protests since, as indicated, they were classified by the Customs officials under item 548.05, TSUS.

The pertinent statutory provisions are as follows:

*Classified by Customs officials under:*
    TSUS:
        "Articles chiefly used in the household or elsewhere for preparing, serving, or storing food or beverages, or food or beverage ingredients; smokers' articles, *household articles*, and art and ornamental articles, all the foregoing not specially provided for [italic added]:

\*          \*          \*          \*          \*          \*          \*

        Other glassware (entered or withdrawn from warehouse before January 1, 1968):
            Valued not over $1 each:

\*          \*          \*          \*          \*          \*          \*

546.51                    Other_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _    50% ad val."
    TSUS as modified by T.D. 68–9:
        "Other glassware (entered or withdrawn from warehouse after January 1, 1968):

\*          \*          \*          \*          \*          \*          \*

        Other:
546.52                    Valued not over $0.30 each_    50% ad val."

*Claimed by plaintiff under:*
    TSUS or TSUS as modified by T.D. 68–9:
        "*Containers* (except ampoules) *chiefly used for the packing, transporting, or*

*marketing of merchandise,* and containers chiefly used for home canning and preserving, all the foregoing, of glass, with or without their closures and whether or not coated with plastics materials [italic added]:

\*　　\*　　\*　　\*　　\*　　\*　　\*

Other:

\*　　\*　　\*　　\*　　\*　　\*　　\*

545.27　　　　Holding over 1 pint_____　0.4¢ per lb. [before 1–1–68] 0.35¢ per lb. [1968] 0.3¢ per lb. [1969]"

*Alternatively claimed by plaintiff under:*
　　TSUS or TSUS as modified by T.D. 68–9:
　　　　"Articles not specially provided for, of glass:

\*　　\*　　\*　　\*　　\*　　\*　　\*

548.05　　　　Other_____　25% ad val. [before 1–1–68] 22% ad val. [1968] 20% ad val. [1969]"

Against this statutory background, the question presented is whether the imported glass jars are other glassware household articles, as classified; other glass containers chiefly used for the packing, transporting, or marketing of merchandise, plaintiff's primary claim; or other articles of glass, not specially provided for, as alternatively claimed.

On the record before the court and for the reasons that follow, it is the determination of the court that all of the imported glass jars are properly classifiable as other "(a)rticles not specially provided for, of glass," under item 548.05. Hence, under the item of the tariff schedules, they are dutiable at the rate of 25, 22, or 20 per centum ad valorem depending upon the date of entry.

In addition to the official papers, the record consists of the testimony of 3 witnesses for the plaintiff, 16 exhibits, 10 introduced by the plaintiff and 6 by the defendant, and the record in the case of *Corrigan Dispatch Co., a/c S. Riekes and Sons et al.* v. *United States*, 264 F. Supp. 897, 58 Cust. Ct. 110, C.D. 2899 (1967).

The parties stipulated that the glass jars in their imported condition are clear, and that the color processing occurs after importation. It was also stipulated that all of the glass jars are closed at the bottom, and that, after importation and further manufacturing, the final product is used with stands.

Plaintiff's first witness, Mr. Max Riekes, is chairman of the board of S. Riekes & Sons and president of plaintiff Riekes Crisa Corp. Mr. Riekes, who has been associated with these companies for over 40 years, identified Riekes Crisa Corp., as an importer of glassware from Mexico, and stated that the companies which also deal in domestic merchandise are involved in the container business selling items such as serum bottles, beverage bottles, and pharmaceutical bottles. The witness, who has traveled throughout the United States supervising sales and attending trade shows, testified also that showrooms are maintained in San Francisco, Los Angeles, Denver, Dallas, Chicago, Atlanta, and New York, and that their merchandise is sold throughout the United States and Canada to manufacturers and to the gift trade. Mr. Riekes visits the factory and is responsible for the purchase orders placed with his companies' Mexican manufacturer, Cristaleria, S.A.

Mr. Riekes also testified that he is familiar with the merchandise known as the "Parisian" or teardrop-style glass jar. He identified it as the merchandise at issue in the incorporated *Corrigan* case, and one of the styles of the three glass jars in the present action. In *Corrigan*, the "Parisian" jars were described as "clear cone-shaped containers of approximately 9 inches in length with the middle portion bulging out to a diameter of from 3 to 4 inches, narrowing at the top to an opening of about 2 inches and tapering to a point at the bottom."

The witness identified plaintiff's exhibit 1 as a representative sample of another style of glass jar imported in a clear condition known as the "Tiffany." Exhibit 2 was a drawing prepared by the Mexican manufacturer, Cristaleria, S.A., illustrating a third style clear glass jar known as the "Monterrey" or "Hurricane," and exhibit 3 was a red-colored sample of that article as it appears subsequent to the addition of color. He testified that all of the imported glass jars were sold by plaintiff exclusively to the Reed Candle Co. of San Antonio, and were not offered for sale to anyone else.

As imported, the merchandise was not marked with the name of the country of origin. The official papers reveal letters from the Reed Candle Co. to the appropriate Customs official requesting a waiver of the conventional marking requirements for these articles since they were to be further processed before sale. Some of the entries bear a rubber stamp, affixed by the Customs official at Laredo, which states that marking was waived under the Tariff Act of 1930, as amended. 19 U.S.C. 1304(a)(3)(G). On the statutory requirement that imported merchandise be marked with the English name of the country of origin, see *Globemaster, Inc.* v. *United States*, 340 F. Supp. 974, 68 Cust. Ct. 77, C.D. 4340 (1972).

Mr. Riekes testified that, as a result of his visits to the Reed Candle Co. plant, he has seen the glass jars processed and packed, knows how

they are used and how they are advertised for sale. All of the glass jars have a capacity of over 1 pint and are designed to be used with a stand.

On cross-examination, Mr. Riekes testified that during the period 1964 through 1969 the plaintiff sold open-bottom, hurricane-style articles to the lamp industry. He explained that when done, the bottom is cut from the glass jar solely for the use of the lamp industry.

He identified defendant's illustrative exhibit A as a page from the catalog of the Indiana Glass Co. depicting "votive" candle lamps and testified that those articles are chiefly used in the home as nightlights for decorative and religious reasons. The witness was familiar with the articles illustrated on defendant's exhibit B, consisting of pages 30–34 of the Davidson Uphoff Co. catalog, which depicted various candelabras with hurricane glass heads. He stated that these articles do not have closed bottoms, are sold only to retail florists, and are used for "weddings, funerals—anything in a church."

A page from the brochure of the Blenko Glass Co., defendant's illustrative exhibit C, was identified by Mr. Riekes as depicting handmade, decorative, free-form glassware. He explained these differences between Blenko's articles and the "Tiffany" glass jars: Blenko's are made by hand, without specifications as to size and height, and are used for decorative purposes while plaintiff's "Tiffany" jars are manufactured to exact specifications as to size and height, and are designed to hold an exact amount of wax.

Defendant's exhibit D pertained to the old-style "Monterrey" candle jar which Mr. Riekes testified had been imported by plaintiff on only two occasions for sale to the Reed Candle Co. between 1964 and 1969.

On redirect examination, Mr. Riekes testified that he knew an article known as a "votive candle," and identified it as a small candle used in a "votive glass." Its use, he stated, was for decorative purposes, heating, or "just to keep things warm." He also testified that this article is "sold * * * in all department stores."

On re-cross-examination, the witness identified style 1985, illustrated on defendant's exhibit A as being a votive candle lamp, and testified that because it is an expensive article, he has not seen it in use on restaurant tables except on special occasions.

Plaintiff's second witness, Mr. Peter Reed, the board chairman of the Reed Candle Co. of San Antonio, testified that he has been with that company for the past 26 years, and had previously served in other capacities, including production manager. During the period 1964 through 1969 he was in charge of manufacturing. His company manufactures and sells candles to large grocery chains, the institutional trade, and to churches.

The witness testified that he was familiar with the "Parisian" glass jars that were the subject of the *Corrigan* case, and has read the transcript of the testimony given in that case by his brother, Henry Reed. He affirmed that as to the use, handling, marketing, and distribution of that article, his testimony would be the same.

On the "Tiffany" and the "Monterrey" glass jars, exhibits 1 and 3 in this case, the witness testified that after receiving them from the plaintiff in a clear condition, his company converts them into candles, i.e., the glass jar is colored, the wick is inserted, and the jar is then filled with wax. His company never sold the glass jars in their imported condition, nor did it sell the wax without the jars, it being more economical for the users to reorder the entire article.

He identified plaintiff's collective exhibit 4 as advertising literature prepared by his company illustrating the "Monterrey" jars and the stands or holders with which they are sold or used. Plaintiff's collective exhibit 5 is advertising literature which illustrates the "Tiffany" jars, the stands or holders designed for them, and the manner in which they were decorated and used when filled with wax. He stated that the imported jars are made to Reed's specifications as to size and shape. In order to meet the requirements of the institutional trade, they are specially designed to burn properly and provide illumination for 140 hours.

On the sale of the imported merchandise, the witness testified that after his company received orders at its San Antonio office from the John Sexton Co., it was shipped directly to the end users, i.e., restaurants, hotels, and country clubs.

Exhibit 6 was offered in evidence as a carton used for shipping one dozen candles, and exhibit 7 as a sample of the "Parisian" style candle after it had been consumed. The witness affirmed that after the candle is burned, the article is not suitable for any other use and is thrown away.

On cross-examination, Mr. Reed testified that he is aware that there are candles which are used to refill glass cylinders after the wax is consumed, and that defendant's exhibit E appeared to be a sample of a refill-type candle. From the testimony, however, it was clear that the imported jars are not refilled, but are thrown away after the candles are burned.

He stated that his company sells the "Parisian" and the "Monterrey" candle lamps in 12 colors, including a clear version. The "Tiffany" is made in 12 or 13 colors. He explained that the purpose of adding color to the glass is to give the customer a choice of color to match the decor of the restaurant. Mr. Reed did not agree that the "Parisian" is a candle lamp, and stated that it is a candle in a holder. He agreed that because of the design of the jar and the stand, the "Parisian" glass jar fits only in a Reed Co. candle stand.

Mr. Reed was aware of fishbowl-type glass jars with a net and poured-in wax, and testified that he had seen them used at parties, dances, and restaurants for illumination, and that they are institutional articles. He also stated that he had used a fishbowl-type candle in his yard, and had seen it used outside at garden parties.

On cross-examination, the witness testified that his company does manufacture and sell candles for household use and the giftware trade. The "Tiffany," the "Parisian," and the "Monterrey" candles could be used in the home, if they could be obtained from the John Sexton Co. He emphasized, however, that his company sells these articles exclusively to the John Sexton Co., which in turn sells only to institutional buyers.

Referring to defendant's exhibit F, a page from the brochure of the Miracle Candle Co. of Laredo, Tex., entitled "Candles for Wrought Iron," Mr. Reed testified that he was familiar with the glass jars illustrated therein, and that he had seen that company's products sold in supermarkets. He stated that these jars are usually religious-type articles, and can be used in the home.

On redirect examination, Mr. Reed testified that his company currently distributes candle jars to the institutional trade which are of a different style than the jars at issue, and identified exhibit 8 as a sample of one of those articles, and collective exhibit 9 as literature describing that type of article. Exhibit 10 was received in evidence as a sample of a consumed institutional candle holder similar to exhibit 8. Mr. Reed identified it as illustrative of the condition of the candle after it had been completely burned. He explained that after burning, the glass jar or "container" becomes soiled and unattractive and is, therefore, not reused.

Plaintiff's last witness, Mr. John C. Ryan, testified that he was formerly employed by the John Sexton Co. for over 40 years before his retirement in 1976, having served as branch merchandise manager of the Dallas office from 1948 through 1976. His duties included responsibility for inventory, purchasing, quality control, pricing, distribution, and preparation of promotional material for the salesmen. He testified that the John Sexton Co. is a wholesale institutional grocer, and that it did not offer its candles and stands to any trade other than the institutional trade.

Mr. Ryan testified that he had read a transcript of the testimony in the *Corrigan* case given by Mr. Thomas H. Butler, the present general manager of the Dallas division of the John Sexton Co. He stated that, if asked the same questions as were asked of Mr. Butler as to the Reed Candle Co. institutional candles and stands, his testimony would be the same.

Mr. Ryan testified that the John Sexton Co. did not maintain any stock of Reed candles at its own facilities, and confirmed the testimony given by the previous witness as to the use and sale of its merchandise.

On cross-examination, the witness testified that during the period 1964 to 1969, the John Sexton Co. handled only Reed candles, and did not sell candles, i.e., the wax and wick, without the glass jars.

Upon questioning by the court on the meaning of the words "disposable candles," Mr. Ryan referred to the fact that the company received reorders for the candles, consisting of the glass jar, the wax and wick, rather than for the metal holders or stands.

In contesting the classification of the imported glass jars, plaintiff contends that, based on the uncontradicted testimony of record, together with the relevant testimony and exhibits in the incorporated case, it has clearly established that the imported merchandise is not within the class or kind chiefly used in the household.

In support of its position, plaintiff submits that, because of the doctrine of stare decisis, the decision of this court in *Corrigan* is dispositive of the present case. Notwithstanding that there are three styles of the articles in the case at bar and that only one of them was before the court in *Corrigan*, plaintiff contends that the factual situation is the same in both actions. It indicates that it is apparent from the testimony of the witnesses that the use of all of the imported glass jars is the same, and has not changed since the decision in *Corrigan*. In addition to their present testimony to that effect, plaintiff submits that the witnesses testified that if they were asked the same questions as in *Corrigan*, their answers would be the same.

In the *Corrigan* case, the question presented was whether the "Parisian" glass jars were properly classifiable as blown-glass household articles under the provisions of paragraph 218(f) of the Tariff Act of 1930, as modified. It was plaintiff's primary contention that the merchandise was properly classifiable as jars, wholly or in chief value of glass, unfilled, suitable for use and of the character ordinarily employed for the holding or transportation of merchandise, under paragraph 217 of the act, as modified. In the alternative, plaintiff claimed the jars were properly dutiable as other illuminating articles, wholly or in chief value of glass, for use in connection with artificial illumination, under paragraph 218(c) of the act, as modified.

The court found that, according to the evidence, necessary and significant preliminary steps had to be taken before the containers were ready or commercially fit to hold and transport the merchandise they were exclusively designed to carry. Therefore, as imported, they did not come within the "suitable for use" condition required by the proviso in paragraph 217. Furthermore, the court found and held that the "Parisian" style glass jars were improperly classified as blown-

glass household articles under the provisions of paragraph 218(f). On that aspect of the decision, plaintiff submits that the court reached a conclusion which is applicable to the present case. Plaintiff maintains that the following quotation from the *Corrigan* case indicates that it is controlling authority:

> There can be no doubt that the uncontradicted evidence presented in this case conclusively establishes that the imported items are used in places other than the household, namely, restaurants, hotels, and the like. The weight of the evidence further indicates that the factors of size and shape incorporated into the design of these articles render them dissimilar to glass containers offered to the gift and retail trades. On the basis of such evidence, we find the collector's classification to have been successfully rebutted and the presumption attending that classification overcome. 264 F. Supp. at 901.

Plaintiff urges that here, as in *Corrigan*, the testimony of record establishes that: (1) The articles in issue were specially designed according to Reed's specifications for use as candle containers; (2) they were imported exclusively for the Reed Candle Co.; and (3) after processing were chiefly used in the institutional trade. Moreover, plaintiff emphasizes that they were not offered to the gift or retail trade, and were used in places other than the household.

In view of the foregoing, plaintiff submits that it has successfully overcome the presumption of correctness which attaches to the classification of the glass jars under items 546.51 and 546.52, TSUS, as other glassware household articles, not specially provided for.

Defendant maintains that the record does not support a finding that the merchandise is not of a "class or kind" chiefly used in the household. It argues that the provisions of items 546.51 and 546.52 are use provisions, and that general interpretative rule 10(e)(i) is applicable in the present case. That rule states that "a tariff classification controlled by use (*other than actual use*) is to be determined in accordance with the use in the United States at, or immediately prior to, the date of importation, *of articles of that class or kind to which the imported articles belong*, and the controlling use is the chief use, *i.e., the use which exceeds all other uses (if any) combined.*" [Italic added.]

Defendant states that it does not dispute the factual determination in *Corrigan* that the Reed Candle Co. candle lamps are used in the institutional trade. It emphasizes, however, it is not the use, or even the chief use, of the imported jars that must be established, but rather the chief use of the "class or kind" of merchandise to which they belong. Accordingly, the defendant argues that plaintiff's reliance on evidence establishing the uniqueness of the candles, their special adaptation to the institutional trade, and their dissimilarity to candles chiefly used in the home, is misplaced. The defendant contends that

the record establishes that the imported glass jars come within a "class or kind" of articles used in the household since they fall within the following criteria recently enunciated by the Court of Customs and Patent Appeals in *United States* v. *The Carborundum Co.*, 536 F. 2d 373, 377, 63 CCPA 98, 102, C.A.D. 1172, *cert. denied*, 429 U.S. 979 (1976):

> Factors which have been considered by courts to be pertinent in determining whether imported merchandise falls within a particular class or kind include the *general physical characteristics of the merchandise, the expectation of the ultimate purchasers*, the channels, class or kind of trade in which the merchandise moves, * * * the environment of the sale (i.e., accompanying accessories and the manner in which the merchandise is advertised and displayed, * * * *The use, if any, in the same manner as merchandise which defines the class*, the economic practicality of so using the import, (and) the recognition in the trade of this use. (Citations omitted and italic added.)

The defendant asserts that the "class or kind" of article in issue here is not limited to Reed candle lamps, but includes all candle lamps or candles which belong to the same "class or kind." It argues that the testimony discloses that the imported glass jars are similar to candle lamps used in the home, and that they are used for the same purposes of illumination and decor. It also submits that according to the testimony of plaintiff's witnesses there is no separate class for candles used in the institutional trade, and for candles used in the home. For example, Mr. Reed testified that the candle lamps in issue could be used in the home if they could be obtained from the Sexton Co. In fact, however, they could not be obtained from Sexton.

As in all Customs cases, plaintiff has the burden of overcoming the statutory presumption of correctness which attaches to the classification of the Customs officials. 28 U.S.C. 2635. To overcome this presumption, the plaintiff must prove that the Customs classification was wrong, and that its claimed classification is correct. *United States* v. *New York Merchandise Co.*, 435 F. 2d 1315, 58 CCPA 53, C.A.D. 1004 (1970); *Technical Tape Corp.* v. *United States*, 55 CCPA 38, C.A.D. 931 (1968).

It is not questioned that the provisions for glassware household articles in items 546.51 and 546.52 are "chief use" provisions, and that what must be ascertained is the chief use of the "class or kind" of articles to which the imported glass jars belong. Thus, the initial question presented is whether the plaintiff has borne its burden of proving that the glass jars in question do not belong to a "class or kind" of merchandise chiefly used in the household.

In Customs classification cases, chief use, when in dispute, is a question of fact to be determined on the basis of positive testimony.

*L. Tolbert Co.* v. *United States*, 41 CCPA 161, C.A.D. 544 (1953). Whether the chief use of imported merchandise has been established depends upon the issues and the evidence in each case. *United States* v. *F. W. Woolworth Co.*, 23 CCPA 98, T.D. 47765 (1935).

The case of *United States* v. *The Carborundum Co.*, 536 F. 2d 373, 63 CCPA 98, C.A.D. 1172, *cert. denied*, 429 U.S. 979 (1976), relied upon by both parties in support of their respective positions, sets forth the factors which have been considered by courts in determining whether imported merchandise falls within a particular "class or kind." As previously stated these factors include "the general physical characteristics of the merchandise, the expectation of the ultimate purchasers, the channels, class or kind of trade in which the merchandise moves, * * * the environment of the sale (i.e., accompanying accessories and the manner in which the merchandise is advertised and displayed), * * * the use, if any, in the same manner as merchandise which defines the class, the economic practicality of so using the import, (and) the recognition in the trade of this use." 63 CCPA at 102.

Applying the foregoing pertinent factors to the evidence in this case, it is the finding of the court that the plaintiff has successfully established that the imported glass jars do not belong to a "class or kind" of merchandise chiefly used in the household. The uncontroverted testimony, which the court finds to be credible and reliable, proves beyond question that the imported glass jars are used in places other than the household, namely, the institutional trade which consists of restaurants, hotels, and other public places.

The record clearly discloses that the imported glass jars were specially designed according to Reed's specifications, and were further processed in order to be used as a component part of a candle or candle lamp by institutional users. Their design was the result of experiments with various sizes and shapes in order to meet the specific requirements of the institutional trade. One of these requirements was for a minimum burning time of 140 hours. To achieve this, the manufacturer had to adhere strictly to the exact diameter of the glass jar. Another requirement was for the opening or mouth of the jar to be so designed as to permit a proper amount of oxygen to enter, while at the same time permitting the right amount of carbon exhaust to escape without causing adverse smoking conditions or odor. In addition, each jar was specially designed for use with a stand or holder.

The unquestioned testimony also shows that the imported glass jars were delivered exclusively to John Sexton Co., a wholesale institutional jobber; that they were usually colored and filled with a low-melting wax; that they were processed and converted by the Sexton Co. into institutional candles; that the candles with the stands were

distributed by the Sexton Co. solely to institutional users; and that they were not offered for sale to the gift or retail trade. In summary, the article that was manufactured was an institutional candle designed to fulfill the "expectation of the ultimate purchasers." 63 CCPA at 102.

While *Corrigan* did not deal with the identical tariff provisions under which the merchandise at bar was classified, it finds substantial application here. The merchandise at bar is similar in all material respects to the merchandise in *Corrigan*. The "Parisian" glass jar, the merchandise in *Corrigan*, is one of the three glass jars in the present case. The remaining two glass jars, the "Tiffany" and the "Monterrey," are, without dispute, the same in character, use, and function as the "Parisian" jars. Hence, what was said in *Corrigan*, as to the nature or kind of merchandise in issue, is also applicable here.

Moreover, as to the judicial interpretation and application of the concept of "chief use," there is no basic distinction between the provisions for "blown-glass household articles" in paragraph 218(f) of the Tariff Act of 1930 involved in *Corrigan*, and the present provisions for "glassware household articles" in items 546.51 and 546.52 of the tariff schedules. In both statutory provisions, the fundamental question for determination is the same, i.e., whether the imported articles belong to a class or kind of merchandise chiefly used in the home.

As was pointed out by the court in *Corrigan*, "(t)he collector's classification of the instant merchandise as blown-glass household articles carries with it the presumed finding of fact that they are chiefly used in or about the environs of the home. *M. Pressner & Co.* v. *United States*, 49 Cust. Ct. 221, Abstract 67019; *Ace Importing Co., Inc.* v. *United States*, 44 Cust. Ct. 468, Abstract 64185." 58 Cust. Ct. at 115. This presumption was rebutted in *Corrigan* as to the "Parisian" glass jar. Since the "Parisian" glass jar is similar in all material respects to the remaining two imported glass jars, what was said as to the rebuttal of the presumption of correctness in *Corrigan* also applies here.

The rationale of the court in *Corrigan*, in denying the classification of the "Parisian" glass jar as a "blown-glass household article" under the provisions of paragraph 218(f), is fully applicable to the present situation. Surely, the specific determination of this court in *Corrigan*, that the "Parisian" glass jar is used in places other than the household, further supports plaintiff's position here.

Defendant does not dispute the factual determination in *Corrigan* that these particular Reed Candle Co. candle lamps are used exclusively in restaurants and hotels. It maintains, nevertheless, that they are classifiable as glass household articles if "they belong to a class or kind of glass articles chiefly used in the home."

The defendant has failed to supply the court with any evidence in support of its position. The record is devoid of any evidence that the imported glass jars were designed and sold for use in the household. On the contrary, as the record reflects, the plaintiff has submitted uncontradicted evidence that the imported glass jars are of a special design rendering them dissimilar to glass containers offered to the gift and retail trade, and that, when further processed, are used in places other than the household.

Furthermore, defendant's attempt to establish that variously styled candle lamps manufactured by Reed's competitors, the Indiana Glass Co., and the Miracle Candle Co., were used both in the home and in restaurants is not helpful. Testimony to the effect that other articles, similar in certain respects to the imported glass jars after processing, may be used in the home as well as in restaurants does not establish the chief use of the glass jars in issue. In its most favorable evaluation, this testimony would simply tend to show that the imported glass jars, after processing, are capable of, or adaptable for, use in the home.

The argument of capability or adaptability of the imported merchandise to the common use of the class in establishing chief use was considered and reviewed by this court in *The Baltimore & Ohio R.R. Co.* v. *United States.* 40 Cust. Ct. 58, C.D. 1959 (1958). In that case, the court found that the imported after-dinner cups and saucers belong to a class of novelty articles chiefly used for display or decoration, and were, therefore, dutiable as decorated china other than tableware under the provisions of paragraph 212, Tariff Act of 1930, as modified, rather than, as classified, as tableware under that paragraph. In affirming this decision, the Court of Customs and Patent Appeals made the following pertinent observation:

> Merely because one *can* drink from the imported cups and saucers does not establish the chief use thereof. A fugitive use or a mere susceptibility or capability of use is not controlling as to such chief use. [Italic in original.] 47 CCPA 1, 5, C.A.D. 719 (1959).

Defendant further contends that there is nothing about the nature of the imported merchandise, or merchandise of the same class or kind, which prevents its eventual use in the household. In support of this argument, defendant points to the testimony of Mr. Reed. When asked on cross-examination if there was anything about the "Tiffany" jar which would prevent its use in the home, he replied "(t)here is nothing to physically keep someone from using it, if they can purchase it. But they (would) have to be able to purchase it." The mere fact that the imported glass jars may possess characteristics which do not prevent their use in the household is not proof that they are actually used in the household, and surely does not establish that they are "chiefly used" in the household.

On the testimony of record, the court has concluded that plaintiff has overcome the presumption of correctness attached to the classifications of the imported glass jars under the provisions of items 546.51 and 546.52 of the tariff schedules.

On its primary claim that the imported glass jars are containers chiefly used for the packing, transporting, or marketing of merchandise, plaintiff contends that they are similar in nature, use, and characteristics to the merchandise which was the subject of *Will & Baumer Candle Co.* v. *United States*, 37 CCPA 27, C.A.D. 414 (1949), and *United States* v. *Richard Hudnut*, 15 Ct. Cust. Appls. 463, T.D. 42646 (1928). Hence, plaintiff contends that the holdings and the reasoning of those cases are applicable and controlling here.

In *Will & Baumer Candle Co.* v. *United States*, 21 Cust. Ct. 149, C.D. 1146 (1948), the merchandise consisted of open-end glass containers imported empty. They were designed and sold for the purpose of holding and transporting wax for use as a unit in a sanctuary lamp. They were classified as decorated glassware under paragraph 218(f) of the Tariff Act of 1930. The importer claimed classification under paragraph 217 of that act, as modified, as unfilled jars, wholly or in chief value of glass, not specially provided for, suitable for use and of the character ordinarily employed for the holding or transportation of merchandise. This court found that the article was designed and manufactured for a definite purpose other than as a jar "ordinarily employed for the holding or transportation of merchandise," and that the use of the article as a shipping container was incidental to its main or principal use as a holder for the candle when used in the sanctuary lamp. The court stated that "(t)o fall within paragraph 217, the articles must be not only suitable for use for the holding or transportation of merchandise, but must also be of the character ordinarily employed for such purposes." Therefore, it held the imported jars were not dutiable as jars "suitable for use and of the character ordinarily employed for the holding or transportation of merchandise" within the provisions of paragraph 217. That decision was reversed by the Court of Customs and Patent Appeals. Plaintiff places special emphasis upon the following quoted portion of the decision of the appellate court:

The candles which are "held or transported"—in the instant case they are both held *and* transported—certainly are merchandise, although they are designed for a special use. The containers themselves, the only articles whose classification is of concern here, are certainly suitable for use in holding the candles and for transporting them, and they are in fact ordinarily so used by appellant. Indeed, they appear to have been developed for those precise uses. They ordinarily hold the merchandise before it is sold and hold it while it is being transported to the purchaser, thus meeting both alternatives designated in the proviso.

We do not think that in order to fall within the meaning of the phraseology of the proviso the containers are required to be of a kind suitable to be used and ordinarily used in holding or transporting *all kinds* of candles. Where a special type of such merchandise exists and a specially designed container is made and used for holding or transporting it, we think the requirement of the statute is met, provided, of course, the container meets the statutory requirements in other respects. [Italic in original.] 37 CCPA at 31.

In arriving at its conclusion, the appellate court indicated that it was persuaded by the reasoning of the *Richard Hudnut* case. In *Hudnut,* the merchandise consisted of decorated talcum powder jars which were assessed under paragraph 218 of the Tariff Act of 1922 as blown-glass articles decorated or ornamented in any manner. The jars were imported empty and filled with talcum powder after importation. Then, by means of a "crimping machine," they were fitted with brass sprinkler or shaker tops, the perforations in which may, by means of slides, be opened or closed at will. The tops were so contrived and fitted that they could not be removed without injury to them and the jars. This court found that, "(t)he specific description of these jars and the use to which they are applied are real distinguishing marks that remove them from paragraph 218 and place them under the provisions of paragraph 217." The court also found that they "are of a character ordinarily employed in the holding and transportation of merchandise" and held that the jars therefore fell clearly within the eo nomine provision of paragraph 217 for lime bottles and jars. 51 Treas. Dec. 304, T.D. 42049 (1927). The Court of Customs Appeals, in affirming that decision, said, "(t)he jars involved in this case are suitable for use and of the character ordinarily employed for the holding and transportation of merchandise—talcum powder; and as they are not appliances or implements in chemical or other operations, or bottles for table service, or thermostatic bottles, they are directly covered by the provisions of paragraph 217, and more specifically provided for therein than in paragraph 218." 15 Ct. Cust. Appls. at 468.

Plaintiff submits that the evidence in the present case is the same as in the foregoing cases: (1) The glass jars are specially designed for and used by the Reed Candle Co. solely to contain candles which will burn for approximately 140 hours for use by the institutional trade; (2) the glass jars are designed to be used in holders, or stands, manufactured by Reed; (3) the glass jars are used for packing, transporting, and marketing the candles from the time they are decorated and filled by Reed, throughout the period of storage and distribution by the John Sexton Co. to institutional users, and throughout the period of storage by its institutional customers until the candles are consumed and the jars discarded. Hence, plaintiff concludes that the use of the glass jars in this case is principally for packing, transporting, and marketing the candle while it is in the commercial stage.

Plaintiff also asserts that, although the court in *Corrigan* rejected the importer's primary claim that the "Parisian" glass jars should be classified under paragraph 217 as jars suitable for use and of the character ordinarily employed for the holding or transporting of merchandise, a different finding is appropriate in the present case. Plaintiff insists that the language of item 545.27, which encompasses containers "chiefly used for the packing, transporting, or marketing of merchandise," is much broader than the language in the earlier provisions of the Tariff Act of 1930. Furthermore, the court in *Corrigan* found that the jars were not ready or commercially fit upon importation to hold or transport the merchandise they were exclusively designed to carry since further processing was required. In *Corrigan* the imported glass jars had to be colored and decorated before they were filled with candle wax and the wick. On the other hand, in the instant case the evidence shows that the glass jars were offered and could be used as candle jars in their clear condition as containers for candles without further processing.

Even assuming that the articles at issue were not usable in their imported condition as containers for candles, plaintiff states that they would nevertheless be properly classifiable under item 545.27 pursuant to general interpretative rule 10(h). That rule provides that "unless the context requires otherwise, a tariff description of an article covers such article, whether assembled or not assembled, and whether finished or not finished." Plaintiff submits that the coloring and decorating were the only operations performed on the jars before filling them with wax, and that these operations did not change their nature into something other than candle containers.

Finally, plaintiff contends that it is basic in Customs law that an article may be classified under its eo nomine provision if it has been so far processed, advanced, and dedicated to the making of that article or class of articles, or has been so far advanced beyond the stage of materials as to be commercially fit for use only as that article. See *United States* v. *The Servco Co.*, 477 F. 2d 579, 60 CCPA 137, C.A.D. 1098 (1973), and *Daisy-Heddon, Div. Victor Comptometer Corp.* v. *United States*, 600 F. 2d 799, 66 CCPA 97, C.A.D. 1228 (1979). Consequently, the plaintiff argues that if the glass jars as imported are not deemed to be containers for the packing, transporting, or marketing of candles, then they should nevertheless be considered unfinished containers since the only process performed on them prior to filling them with wax is the coloring and decorating of the glass to enhance their appearance. Plaintiff therefore maintains that whether deemed finished or unfinished, they are nevertheless properly classifiable under item 545.27.

In the alternative, plaintiff claims that should the court determine that the glass jars are not classifiable under item 545.27, TSUS, then

they are classifiable under item 548.05, TSUS, as other articles of glass, not specially provided for. It contends that since the articles are of glass, they come within the purview of item 548.05, a basket provision for those glass articles which are not provided for elsewhere in the tariff schedules.

As to plaintiff's primary claim, defendant contends that the glass jars are not containers for merchandise, but integral parts of candle lamps. It points out that plaintiff's witness, Mr. Reed, testified that after the glass jars are imported, the Reed Candle Co. colors and fills them with wax and a wick, and converts them into candles. Thus, it has created a new article of commerce, a candle or candle lamp. The defendant maintains that since the glass jars have become part of the merchandise which is packed, transported, and marketed, they are not containers for the merchandise. It submits that an article cannot be both the merchandise and the container.

In support of its position the defendant cites the cases of *Bruce Duncan Co.* v. *United States*, 63 Cust. Ct. 412, C.D. 3927 (1969), and *Morris Friedman & Co.* v. *United States*, 56 Cust. Ct. 21, C.D. 2607 (1965). In the *Bruce Duncan* case, metal cartridges filled with butane and invoiced as butane lighter tanks, were classified under item 756.15, TSUS, as parts of cigar and cigarette lighters, Plaintiff claimed that, by virtue of item 475.15 and general headnote 6(b)(i) of the tariff schedules, the tanks were entitled to free entry as the usual transportation containers for butane. The court found that the sole purpose of the cartridge was to serve as a container of fuel for the lighter. It was designed to fill the lighter, and without it the lighter would not be able to function. Whether or not the tanks contained fuel, however, was held to be without significance. The court held these cartridges were not the usual containers envisioned by general headnote 6(b)(i) of the tariff schedules. Notwithstanding the fact that the cartridges served as shipping containers for the butane, the court held that plaintiff failed to overcome the burden of proving that the classification of the cartridges, as parts of cigar and cigarette lighters, was incorrect.

In the *Morris Friedman* case, the merchandise as imported consisted of a decorative ceramic miniature mug or cup, containing a wax or paraffin substance with a wick in the center. The merchandise had been assessed with regular duty under paragraph 1536 of the Tariff Act of 1930, as modified, as a candle, and with an additional duty on the ceramic portion, as an unusual container under paragraph 211, as modified, as decorated earthenware. The court held the candle to be properly dutiable as an entirety under paragraph 211, as modified. In the course of its opinion, the court stated:

> In the instant case, the merchandise is imported as a unit. It cannot be disassembled without destroying one or both of the

components. It is bought and sold as a unit, and functions as a unit. The candle portion never had any separate identity as a candle. While the cup portion might have a separate identity as a miniature mug, it was not imported or used as such, according to the testimony, and required the addition of the wax portion to become the completed article. The cup is *not a container*, usual or unusual, *but an integral functioning portion of the entire article.* [Italic added.] 56 Cust. Ct. at 26.

Defendant contends that the facts in the *Bruce Duncan* and *Morris Friedman* cases are analogous to the present case, and that, therefore, the rationale of those cases is applicable here. Thus, it maintains that the testimony of record here discloses that the glass jars after importation were used as an essential constituent part of the Reed candle lamps; that the wax and wick never had a separate identity as a candle; and that the glass jars were specially designed to become an integral functioning part of Reed's candle lamps. Accordingly, the defendant submits that since the imported merchandise has become an integral part of a manufactured candle, it cannot be both the merchandise and the container.

Defendant submits that prior cases, in which the courts have held imported merchandise to be dutiable as "suitable for use and of the character ordinarily employed for the holding or transportation of merchandise" under predecessor provisions of the Tariff Acts of 1922 and 1930, reveal the type of articles found to be containers. It cites *Balfour-Guthrie & Co.* v. *United States*, 23 CCPA 1, T.D. 47652 (1935) (in which the merchandise consisted of beer (stout) bottles, imported filled with stout); *De Boer & Livingston (Inc).* v. *United States*, 58 Treas. Dec. 387, T.D. 44301 (1930) (in which the merchandise consisted of glass bottles used for holding toilet water); and *Frederick Stearns* v. *United States*, 53 Treas. Dec. 38, T.D. 42542 (1928) (in which the imported merchandise consisted of small glass bottles used to hold Astringosol, a mouthwash).

In each of these cases, the court found the merchandise to be suitable for use, and of the character ordinarily employed, for the holding or transportation of merchandise, and therefore classifiable under paragraph 217 of the Tariff Act of 1930. The defendant states that it is clear that the merchandise in these cases was respectively, the beer, the toilet water, and the mouthwash, and that the glass bottles, in each instance, were the containers.

In *Fontana Hollywood Corp.* v. *United States*, 64 Cust. Ct. 204, C.D. 3981 (1970), long-neck gallon bottles, imported filled with chianti wine, were subject to tariff treatment as imported articles, separate from the wine content, under item 546.35 as household articles. Plaintiff's primary contention was that the imported bottles should not have been separately dutiable. Alternatively, it contended that, in the

event the bottles were found to be separately dutiable, they were properly classifiable as containers of glass chiefly used for packing, transporting, or marketing merchandise under TSUS item 545.27. As to plaintiff's alternative claim, defendant argued for exclusion of the imported bottles from classification under item 545.27 on the ground that they were unusual containers, that is, of a kind not usually or ordinarily employed to ship, transport, or market merchandise. In rejecting defendant's argument, the court said:

> * * * TSUS item 545.27 does not classify containers ordinarily or commonly employed for the holding or transportation of merchandise (as did par. 217). What it does classify are *containers chiefly used for the packing, transporting, or marketing of merchandise.* The fact that a container is chiefly used for the packing, transportation, or marketing of merchandise is not inconsistent with its not being a bona fide container for transportation, or, if you will "unusual," that is, of a kind not usually or ordinarily employed to ship, transport, or market merchandise. [Italic in original.] 64 Cust. Ct. at 212.

The court upheld plaintiff's alternative claim that if separately dutiable as classified, the bottles were properly classifiable under item 545.27 as containers chiefly used to pack, transport, and market the wine.

The defendant indicates that the glass bottles in *Fontana* were not incidental to the merchandise purchased, and had not become an integral part of the wine, or merchandise, as have the glass jars in the present case. It emphasizes that in all of the cited cases, the glass containers had a separate identity, that their use was incidental to the contents, and that they had never become an integral constituent part of the merchandise itself.

The *Will & Baumer* and *Hudnut* cases, and the case at bar, are distinguishable since the imported merchandise is significantly different as to characteristics, use, and function. The glass jars in *Will & Baumer* were designed and sold for the definite purpose of holding and transporting wax candles for use as a unit, and inserted in sanctuary lamps of churches. For that purpose, the jar was designed to have a graduated depression or indentation running practically its entire length, and two lugs or projections on its top rim. The red glass lamp shell, into which the imported glass jar and wax candle were to be inserted, had a lug or bulge in its lower portion which fit into the indentation of the glass jar. Originally, the candles were shipped in wooden or cardboard cases but, due to high temperature and handling, often became damaged and out of shape. To rectify that condition, the glass jars were developed to hold and ship the wax candles. At no time were the imported glass jars subjected to further processing in order to accomplish their intended purpose. They were used in

the condition as imported, and retained their individual identity and characteristics.

Unlike the imported glass jars in *Will & Baumer*, the imported glass jars at bar were not designed to be used in the condition as imported. Necessary and significant operations were performed before they could be used for their intended purpose. As previously noted, they were specifically designed to hold candles which would burn for approximately 140 hours. Moreover, after importation the jars were colored and the wick was positioned before they were filled with wax sufficient to provide the required 140 hours of illumination. The imported glass jars did not retain their individual identity after importation. The necessary processing converted them into an integral component of a new article of commerce, a candle or candle lamp. Furthermore, it may be added that any doubt as to the holding of the *Will & Baumer* case may be resolved by a reference to the *Hudnut* case upon which the appellate court relied for its decision. Indeed, the court in referring to *Hudnut* in that case stated that "the reasoning there seems analogous and persuasive here." 37 CCPA at 32.

In *Hudnut*, the colored lime glass jars, imported empty, were filled with talcum powder after importation, and were used to hold and transport the talcum powder. They were designed exclusively to contain the talcum powder as is evidenced by the fact they were fitted with brass sprinkler tops that were not removable without injury to them or to the jars. Unlike the glass jars of the instant case, their identity was separate from the talcum powder and not subordinated to a new combined article. It is obvious that the glass jars in *Hudnut* are significantly different from the glass jars in this case as to their nature, use, and characteristics.

It should also be noted that in *Will & Baumer* and *Hudnut*, the court was concerned with the statutory interpretation and application of the phrase, unfilled glass jars "suitable for use and of the character ordinarily employed for the holding or transportation of merchandise" in paragraph 217 of the Tariff Acts of 1922 and 1930. In the present case, item 545.27 of the tariff schedules provides for containers *chiefly used* for the packing, transporting, or marketing of merchandise. The issue of chief use was neither raised nor determined in the cited cases. Clearly, a decision which holds articles *suitable* for a certain use does not imply or require a finding of *chief use*. *United States* v. *Lorsch & Co.*, 8 Ct. Cust. Appls. 109, T.D. 37222 (1917).

It is plaintiff's contention that the candle wax packed and contained in the imported glass jars is a commercial commodity or an article of commerce, and is merchandise as that term is used in item 545.27. Hence, it claims that the candle wax is the merchandise for which

the imported glass jars serve as containers, principally used for its packing, transporting, or marketing. Citing the case of *United States* v. *Lilly & Co. and Parke, Davis & Co.*, 14 Ct. Cust. Appls. 332, T.D. 41970 (1927), quoted with approval in *Border Brokerage Co.* v. *United States*, 50 Cust. Ct. 233, Abstract 67500 (1963), plaintiff states that it is well established that the term "merchandise" includes whatever is bought or sold in trade or by merchants.

In the *Lilly & Co.* case, the imported merchandise consisted of glass ampoules or vials, imported empty, and "specially contrived for the transportation of pharmaceutical and biological preparations which are to be used in a medicinal way." The court found that the medicinal and biological products were generally bought and sold commercially, and were therefore within the common meaning of the term "merchandise." In *Border Brokerage*, the imported merchandise consisted of fertilizer sample units that include both a container and fertilizer material. The unit was distributed by the importer as an advertising medium to enhance the sale of its fertilizer material. The court found that the unit—the plastic container and the fertilizer material—was the commericial commodity or the article of commerce, and hence the merchandise.

The respective articles found by the court to be merchandise in the cited cases are distinguishable from the candle wax in the case at bar.

In the *Lilly* case, the merchandise—the medicinal and biological products—had a distinct identity as a separate article of commerce. In transporting these products the imported glass vial also retained its separate identity as a glass vial. Unlike the candle wax in the present case, the medicinal and biological products were not merged by further processing with the glass vial to create a new and distinct article of commerce.

In *Border Brokerage*, the imported merchandise was the fertilizer sample unit which, in its condition as imported, was designed and ready for use as a complete article of commerce. Since the candle wax is not the imported merchandise in the present case, it is clearly distinguishable from the merchandise in *Border Brokerage*. Furthermore, unlike the fertilizer sample unit, the candle wax to fill the imported glass jars was created in the United States, and serves as a necessary integral part of a new article, a candle lamp, without which it could not function. The candle wax does not have a separate identity, use, or commercial value other than as a combined article with the imported glass jars. This conclusion is inescapable from the testimony of plaintiff's witness, Mr. Reed, who stated that due to its low melt point, the wax would have no form or shape without the glass jars. Plaintiff's contention that the candle wax is the merchandise that was packed and transported in the imported glass jars is therefore without merit,

The foregoing considerations also apply to plaintiff's contention that the imported glass jars serve as containers for the candle wax. Although the glass jars may have had separate identity as glass jars, they were neither designed, nor intended to be used as glass jars. They were designed to be further processed after importation, and required the addition of the wax and wick to become a completed article of commerce. The identity of the imported glass jars was subordinated to the new combined article, a candle or candle lamp.

The meaning of "(c)ontainers * * * chiefly used for the packing, transporting, or marketing of merchandise," as used in item 545.27, and particularly the term "containers," was first judicially interpreted in the *Fontana* case, *supra*. In holding that the imported long-neck gallon bottles, filled with chianti wine, were within the purview of that provision, the court quoted the following reference to item 545.27 in the 1960 Tariff Commission report:

> The proposed provisions for "other" containers (TSUS items 542.21 through 545.27) embrace the bottles and jars commonly used for the packing and transportation of merchandise and are substantially unchanged from the existing provisions in paragraph 217. * * * (Tariff Classification Study, schedule 5, p. 139.) 64 Cust. Ct. at 211.

Consistent with this expression that the present tariff description of the term "containers" is substantially unchanged from the predecessor statute, an examination of the legislative history and judicial interpretation of the terms "bottles" and "jars" encompassed by the prior tariff provisions provides further guidance as to the class or kind of articles held to be containers.

The most recent decision of this court on the meaning of paragraph 217 of the Tariff Act of 1930 is the *Border Brokerage* case, *supra*. In that case, the imported fertilizer sample units, which included both a plastic container and fertilizer material, were classified by similitude in use to manufactures of glass, not specially provided for, under paragraph 230(d) of the Tariff Act of 1930, as modified, and paragraph 1559(a), as amended. Plaintiff claimed that the merchandise was properly classifiable under the provision for nonenumerated manufactured articles in paragraph 1558 of the Tariff Act of 1930, as amended. In the alternative, plaintiff claimed that if the imported merchandise was dutiable by virtue of the similitude provision of paragraph 1559(a), it was then classifiable as similar in use to glass vials, jars, or bottles, filled or unfilled, under paragraph 217 of the Tariff Act of 1930. In rejecting plaintiff's alternative claim, the following observation of the court is particularly pertinent:

> The plastic container is an integral component of the present merchandise, in its condition as imported. It is not the kind of

container provided for in paragraph 217 * * *. 50 Cust. Ct. at 235.

In the *Balfour-Guthrie & Co.* case, *supra*, 23 CCPA 1, T.D. 47652 (1935), the court held that certain glass bottles, imported filled with stout, were ordinary beer bottles, and stated that they "are, obviously, designed, suitable, and of the character ordinarily employed, for the holding or transportation of merchandise, and clearly dutiable under paragraph 217." The court indicated that pertinent to its consideration was the determination of the Court of Customs Appeals in *United States* v. *Sassi*, 13 Ct. Cust. Appls. 319, T.D. 41233 (1925). The *Sassi* case dealt with paragraph 217 of the Tariff Act of 1922, the predecessor of paragraph 217 of the Tariff Act of 1930. The imported merchandise there consisted of empty chianti bottles, partly covered with straw, and used for the holding and transporting of vinegar. The bottles were held to be within the scope of paragraph 217, Tariff Act of 1922, as bottles, "suitable for use and of the character ordinarily employed for the holding or transportation of merchandise."

Other cases describing the characteristics of the class or kind of bottles * * * or jars found by this court to be embraced within the provisions of paragraph 217 of the Tariff Act of 1922 have been examined earlier in this opinion. See *De Boer & Livingston (Inc.)* v. *United States*, 58 Treas. Dec. 387, T.D. 44301 (1930), and *Frederick Stearns* v. *United States*, 53 Treas. Dec. 38, T.D. 42542 (1928).

On the provisions of paragraph 217 of the Tariff Act of 1922, the "Summary of Tariff Information" (1929), a recommended source to resolve questions on the meaning and scope of terms which appear in various tariff acts, states at page 504:

GLASS BOTTLES AND OTHER GLASS CONTAINERS

Description and uses.—The glass bottles and other glass containers covered by this paragraph are the usual and *ordinary glass containers used for beverages, foodstuffs, chemicals, medicines, vaccines, antitoxins,* and other *commodities,* such as *scouring* and *cleansing creams, powders, polishes,* and *soaps.* [Italic added.]

The authorities teach that the class or kind of containers intended by Congress to be embraced by the provisions of item 545.27 are the usual, ordinary, and commonly used glass containers for various commodities or merchandise. Hence, the imported glass jars which were designed to be used, and were used, as an integral part of a new article of commerce, a candle or candle lamp, are not encompassed by that provision.

As previously noted, plaintiff's claimed classification is based on chief use. It is axiomatic that chief use "is to be determined in accordance with the use in the United States at, or immediately prior

to, the date of importation, of articles of that class or kind to which the imported articles belong, and the controlling use is the chief *use*, i.e., the use which exceeds all other uses (if any) combined." TSUS general interpretative rule 10(e)(i).

On the record presented and the applicable authorities, it is the determination of the court that the imported glass jars are not containers, as that term is used in item 545.27, and do not meet the requirement of chief use as containers within that statutory provision.

Plaintiff has referred to general interpretative rule 10(h) which provides that "unless the context requires otherwise, a tariff description for an article covers such article, whether assembled or not assembled, and whether finished or not finished." It maintains that the only processing performed on the imported glass jars, prior to their filling with candle wax and wick, was the coloring and decorating. Accordingly, plaintiff contends that this operation did not change the nature of the imported glass jars into something other than candle containers, the use for which they were dedicated in their condition as imported.

Plaintiff has also urged that in Customs law an article may be classified under the eo nomine provision for that article if it has been so far processed, advanced, and dedicated to the making of that article or class of articles, or has been so far advanced beyond the stage of materials as to be commercially fit for use only as that article. *United States* v. *The Servco Co.*, 477 F. 2d 579, 60 CCPA 137, C.A.D. 1098 (1973); *Finn Bros. Inc.* v. *United States*, 454 F. 2d 1404, 59 CCPA 72, C.A.D. 1042 (1972); *American Import Co.* v. *United States*, 26 CCPA 72, T.D. 49612 (1938). The principle stated is inapplicable here for the record shows that the imported glass jars were not dedicated to use merely as containers. The jars were employed as articles to be further processed in the ultimate production of a new and different article, to wit, a candle or candle lamp, an article with a distinctive character and intended use, different from the imported glass jars. Therefore, the imported glass jars cannot be considered containers, whether finished or unfinished.

Plaintiff's contention that the eo nomine designation applies to this case is unpersuasive for two additional reasons. First, it is clear that the term "containers" in item 545.27 is a "use" description, and not an "eo nomine" designation. Second, the eo nomine designation has no application since the record conclusively establishes that the imported glass jars were so far advanced by processing as to become more than mere glass jars. They were transformed into a new and different article, a candle or candle lamp. On this point, the following observation of

this court in *der Brokerage Co.* v. *United States*, 41 Cust. Ct. 264, C.D. 2049 (1958), is particularly pertinent:

We are in accord with the general principle of law, which is well established and widely used in customs jurisprudence, that an eo nomine designation without terms of qualification or limitation embraces the named product in all forms and conditions. However, the principle of law is not to be used indiscriminately or without limitation. Where an article has been so far advanced as to have been transformed into a new article or dedicated to a particular use, this principle of law is inapplicable. 41 Cust. Ct. at 266.

The court has determined that the imported glass jars were improperly classified as other glassware household articles under the provisions of items 546.51 and 546.52 of the tariff schedules. It is also the determination of the court that the plaintiff has failed to sustain its burden of proof that the imported glass jars are properly classifiable under item 545.27 of the tariff schedules as "(c)ontainers * * * chiefly used for the packing, transporting, or marketing of merchandise." With respect to those glass jars classified under items 546.51 and 546.52, it is necessary to determine the validity of plaintiff's alternative claim under item 548.05. Plaintiff contends that if its claim for their classification under item 545.27 is not sustained, then they are properly classifiable under item 548.05, a basket provision for all articles of glass, not specially provided for. *L & B Products Corp.* v. *United States*, 70 Cust. Ct. 30, C.D. 4404 (1973); "Tariff Classification Study," schedule 5 at 145.

It is undisputed that all of the imported glass jars in issue are, in fact, glass articles. Since there is no more specific provision in the tariff schedules under which they may be classified, they come within the purview of item 548.05 as alternatively claimed by plaintiff. Consequently, the classification of the Customs officials is overruled as to all of the "Tiffany," all of the "Monterrey," and those "Parisian" glass jars classified under items 546.51 and 546.52; and sustained as to those "Parisian" glass jars classified under item 548.05.

Accordingly, upon the record before the court and for the reasons stated, it is the determination of the court that all of the imported glass jars are properly classifiable under the provisions of item 548.05 of the Tariff Schedules of the United States (TSUS) as other articles, not specially provided for, of glass, and dutiable at the rate of 25, 22, or 20 per centum ad valorem depending upon the date of entry.

Judgment will be entered accordingly.