POLLAK IMPORT EXPORT CORP., PLAINTIFF *v.* UNITED STATES, DEFENDANT

Court No. 88-08-00649

(Decided February 14, 1992)

*Fitch, King and Caffentzis, (James Caffentzis)*, for plaintiff.
*Stuart M. Gerson*, Assistant Attorney General; *Joseph I. Liebman*, Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, (*Susan B. Mansfield*), for defendant.

## MEMORANDUM OPINION AND ORDER

GOLDBERG, *Judge:* Plaintiff challenges the classification of certain merchandise imported from Hong Kong and described on the customs invoices as "wool knitted cardigan sweaters (ladies 100% wool knitted jacket)."

Customs classified the merchandise under item 384.62 of the Tariff Schedules of the United States (TSUS), as "Other women's, girls' or infants' wearing apparel, not ornamented: Of wool: Knit: Other: Valued over $5 per pound: Coats." Duty was assessed at the rate of 20 per centum ad valorem plus $.32 per pound for entries made during 1986 and 20 per centum ad valorem plus $.31 per pound for entries made during 1987.

Plaintiff asserts the merchandise is properly classifiable under the item 384.63, TSUS, as "Other women's, girls', or infants' wearing apparel, not ornamented: Of wool: Knit: Other: Valued over $5 per pound: Other," with duty at the rate of 17.5 per centum ad valorem plus $0.06 per pound for entries made during 1986 and 17 per centum ad valorem for entries made during 1987.

## BACKGROUND

The merchandise consists of a waist-length women's jacket. It has a full front opening, long narrow sleeves and no collar. The jacket is con-

structed from boiled knit wool panels and is manufactured in many different colors. It is commonly known as a "boiled wool jacket."

Customs classified the merchandise under item 384.62, TSUS, covering ladies knit wool coats, by following its Textile Category Guidelines for Fabric and Garments and its past practice of classifying all jackets as coats.

Plaintiff claims the merchandise is properly classified under item 384.63, TSUS, as other women's wearing apparel, because of its general physical characteristics, the expectation of the ultimate purchasers, the channels of trade in which the jacket moves, the manner in which the jacket is displayed, and the use of the jacket.

## THE TRIAL TESTIMONY

At trial on October 7, 1991, plaintiff presented the testimony of Henry Pollak. Mr. Pollak is the chairman and former president of plaintiff, Pollak Import Export Corporation, and has been associated with the firm for 46 years. Mr. Pollak testified that plaintiff's business is almost entirely comprised of the sale of sweaters. He stated that the imported jacket is made of knit wool yarn, which is also used to make some types of sweaters. He testified that the imported jacket is designed to be worn indoors, coordinated with an outfit.

Mr. Pollak stated that a jacket should not be considered a coat unless it is designed to protect against the elements. He explained that some jackets are designed to be worn indoors, coordinated with another article of clothing, and others are designed to be worn outdoors to afford the wearer warmth and protection from the elements. He testified that a woman must wear a coat over the imported jacket to shield against the elements since the jacket is not designed to provide such protection.

Plaintiff also presented the testimony of Joseph Mule, its vice president who has been associated with plaintiff for 45 years. Mr. Mule formerly worked as a buyer for plaintiff. In Mr. Mule's opinion, only those jackets that protect the wearer from the elements are "coats." Since the imported jacket does not shield the wearer from the elements, it could not in his view, be considered a "coat."

Finally, plaintiff presented the testimony of Gloria Hartley, who has worked in the knitwear and sportswear industry for 28 years. Ms. Hartley is an instructor in fashion buying and merchandising, and a coordinator of international trade and marketing at the Fashion Institute of Technology. She also works as a consultant to manufacturers and retail stores on the development of different classifications of knitwear. Prior to teaching at F.I.T., Ms. Hartley was a sportswear and sweater buyer for various nationally recognized department stores.

Ms. Hartley stated that some jackets may be coats, while others may be sportswear. In her opinion, where jackets are treated for water repellency and used for outerwear, they may be considered coats. However where jackets are worn indoors, coordinated with an outfit, they are not coats, but sportswear.

Defendant presented the testimony of Michael Crowley, a national import specialist for the Customs Service who is responsible for the classification and valuation of women's knit wearing apparel. Mr. Crowley has been a national import specialist since 1974, and formerly worked as an import specialist for the Customs Service for 11 years. Mr. Crowley testified that at the time of the classification, he had seen the garment worn at knitwear trade shows with a skirt and over a blouse. He admitted that he had never seen the garment worn in public.

He explained that the imported jacket was classified by the Customs Service as a coat because it has a full-front opening and sleeves. The knit fabric is boiled, so that it loses some of its elasticity. It is tailored, or constructed of several sewn panels, and would be worn over other wearing apparel for warmth and protection from the elements.

In addition, defendant presented the testimony of Tibor Feldmar, president of House of Loden. House of Loden sells traditional Austrian garments made of loden material. Mr. Feldmar testified that the imported jacket is a copy of an Austrian loden jacket. He stated that the jacket is used in Austria as a winter jacket, and is worn skiing. He indicated that he believed that several years ago it began being used as a "coat" in the United States. He testified that in his opinion, the imported jacket is not worn indoors and a coat cannot be worn over it. He stated that in his opinion, it is water repellant. He testified that the jacket is worn as an outdoor garment because it provides protection against the elements and must be removed upon coming indoors.

### DISCUSSION

#### A. *Classification Issue:*

To determine whether the imported jacket was properly classified, the court must consider "whether the government's classification is correct, both independently and in comparison with the importer's alternative." *Jarvis Clark Co. v. United States,* 733 F.2d 873, 878, *reh'g denied,* 739 F.2d 628 (Fed.Cir. 1984). Pursuant to 28 U.S.C. § 2639(a)(1) (1982), the government's classification is presumed correct, and the burden of proof is upon the party challenging the classification. 733 F.2d at 876.

The parties disagree both as to the correct meaning of the term "coats," and as to whether the imported jacket fits within the meaning of the term. The meaning of a tariff term is a question of law. *Digital Equip. Corp. v. United States,* 889 F.2d 267, 268 (Fed. Cir. 1989). The tariff term "coats" is not defined in the TSUS and there is no legislative history to shed light on its correct meaning.

It is well settled customs law that when a tariff term is not defined in either the TSUS or its legislative history, the correct meaning of a term in a tariff provision is the common meaning understood in trade or commerce. *Schott Optical Glass, Inc. v. U.S.,* 67 CCPA 32, 612 F.2d 1283, (1979). The common meaning of a tariff term is a question of law. *Id.* A court may rely upon its own understanding of terms used, and may consult standard lexicographic and scientific authorities, to determine the

common meaning of a tariff term. *Trans-Atlantic Co. v. U.S.,* 60 CCPA 100, 471 F.2d 1397 (1973).

To assist the court in determining the common meaning of the tariff term "coats," defendant introduced various dictionary definitions as well as the Customs Service's Textile Category Guidelines for Fabric and Garments for 1979 and 1987. The differences between the coat provisions in the 1979 and 1987 Guidelines are insignificant. The 1987 Guidelines provide that to be a coat: (1) "the garment must cover either the upper part of the body or both the upper and lower parts of the body"; (2) "[it] must normally be worn over another garment, the presence of which is sufficient for the wearer to be considered modestly and conventionally dressed for appearance in public, either indoors or outdoors or both"; (3) and "it must have a full or partial front opening, with or without a means of closure, and sleeves, of any length."

Mr. Crowley explained that under both the 1979 and 1987 Guidelines, the imported jacket could be classified as a sweater because of its thickness. However, because it is tailored, it is instead classified as a coat. He further testified that the 1987 Guidelines specifically provide that all cardigans which are tailored fall within the "coat" classification.

In addition, defendant introduced several previous Customs Service decisions to show a long-standing practice of classifying waist-length jackets as "coats."

To the contrary, plaintiff introduced testimony asserting that the common meaning of the tariff term "coats," includes only those garments which have sleeves, and are chiefly worn outdoors, over other clothing, for warmth and protection from the elements.

Plaintiff and defendant introduced several dictionary definitions which contained generally comparable descriptions. For example, the parties introduced the following definition of "coat":

> "1. An outer garment fitting the upper part of the body; now, one opening in front and usually reaching below the waist; esp., such a garment worn by men." (Webster's, *New International Dictionary,* 2d Edition, Unabridged (1961).)

Pursuant to *Trans-Atlantic Co.,* 471 F.2d at 1397, the court also examined a more recent definition of the term "coat." It too contained similar language:

> "1 a: an outer garment varying in length and style according to fashion and use." Webster's, *Ninth New Collegiate Dictionary,* (1988).

The Customs Guidelines and the past practice of the Customs Service provide little direction to this court in defining the common meaning of the tariff term "coats." Both are excessively expansive and fail to discuss its intended use. Similarly, the quoted dictionary definitions, as well as the others introduced, offer only limited assistance since the descriptions are overly broad, and simply vague. They again merely characterize the function of a "coat" as being an "outer garment."

Therefore, this court finds that, pursuant to *Trans-Atlantic Co.,* 471 F.2d at 1397, it must rely on its own understanding of the common meaning of the tariff term "coats." Based upon the testimony heard at trial, this court understands, and so holds, that the common meaning of a "coat" is a garment chiefly worn outdoors, over other clothing, to provide protection from the elements.

With the common meaning of the tariff term "coats" so defined, the court turns to the more specific question, namely whether the imported jacket is chiefly worn outdoors, over other clothing, to provide protection from the elements. Because the common meaning of the tariff term "coat" depends on the manner in which the garment is used, the court finds the tariff classification "coat" to be a use classification.

General Interpretative Rule 10(e)(i) of the TSUS requires that a tariff classification controlled by use (other than actual use) be determined in accordance with the use in the United States at, or immediately prior to, the date of importation, of articles of that class or kind to which the imported articles belong, and the controlling use is the chief use.

The chief use of imported merchandise is "the principal or predominant use. It does not envision exclusive use, but rather contemplates the usual and common use." *Teleflora Prods., Inc. v. U.S.,* 13 CIT 839, 724 F. Supp. 963, 968 (1989). "[A] mere susceptibility or capability of use is not controlling as to chief use." *Id.* (*quoting Riekes Crisa Corp v. U.S.,* 84 Cust. Ct. 132, 145, C.D. 4852 (1980)).

In *United States v. Carborundum Co.,* 63 CCPA 98, C.A.D. 1172, 536 F.2d 373 (1976), *cert. den. Carborundum Co. v. United States,* 429 U.S. 979 (1976), the Court of Customs and Patent Appeals established criteria to be considered when determining the chief use of an imported article. The *Carborundum* court stated that courts must look to: (1) the general physical characteristics of the merchandise; (2) the expectation of the ultimate purchasers; (3) the channels, class or kind of trade in which the merchandise moves; (4) the environment of the sale (i.e., accompanying accessories and the manner in which the merchandise is advertised and displayed); (5) the use, if any, in the same manner as merchandise which defines the class; (6) the economic practicality of so using the import, and the recognition in the trade of this use.

An examination of the merchandise and the trial testimony reveals that the jacket is waist-length and collarless, with long narrow sleeves and a full front opening with small buttons. Mr. Mule testified that it is made with woolen yarn, knit on a circular knitting machine, washed in a temperature controlled machine and finally steam ironed and blocked. He stated that the fabric was not treated to be waterproof.

The testimony of plaintiff's witnesses established that the jacket travels in the same channels of trade as sweaters and sportswear. Ms. Hartley testified that plaintiff is located in the sweater and sportswear section of the garment district, which is distinct from the coat district. Mr. Pollak testified that the jacket was not designed to meet the needs of coat purchasers, but instead imported at the request of sweater buyers

to meet their needs of a coordinate jacket. Mr. Pollak explained that his sportswear and sweater customers, who had been purchasing a similar item from Austria, requested that he attempt to import it. He then located suppliers in Hong Kong, devised marketing programs to sell the merchandise, and successfully sold the jacket to the sportswear and sweater markets.

Plaintiff introduced three exhibits which Mr. Mule testified were knitted jackets, made of acrylic yarn or wool, and marketed by plaintiff as jackets. These three jackets resembled the imported jacket in that they had front-closures and were approximately waist-length. However, none of them consisted entirely of the boiled knit wool fabric as did the imported jacket. Mr. Mule testified that the imported jacket is marketed in the same manner as these jackets. He stated that these exhibits were classified by the Customs Service as sweaters.[1]

The testimony of Ms. Hartley established that the ultimate purchaser expects to wear the jacket indoors. She stated that the jacket is worn by itself, or over a very lightweight blouse since the sleeves are narrowly cut and the jacket is unlined. It is a coordinate, "used to pull together a look". She explained that a coat is worn over the imported jacket outdoors to protect the wearer from the elements.

The imported jacket is advertised and displayed as a jacket coordinate. Ms. Hartley testified that when she worked as a buyer at Bloomingdale's, boiled wool jackets similar to the imported jacket were shown to the sweater buyers. She explained that in department stores the imported jacket and similar jackets are sold in the sportswear department, which is distinct from the coat department.

Plaintiff introduced three catalogues that advertised the imported jacket. In each catalogue, the imported jacket was shown on a model wearing a coordinated skirt and a light blouse. Ms. Hartley explained that the imported jacket was advertised in these catalogues as a coordinate, i.e., an indoor garment.

On cross-examination and recross-examination, Ms. Hartley explained that a coordinate is an item that can stand alone, or be worn together with other items "to pull together the entire look." She stated that a coat is not a coordinate because it stands alone and is worn over other clothing that is not normally seen; "whereas, in a coordinated outfit, you see the other part of the item."

From the general physical characteristics of the jacket, the expectation of the ultimate purchasers, the channels of trade in which the jacket moves, the manner in which the jacket is displayed, and the use of the jacket, the court finds that the imported jacket is chiefly used as a indoor coordinate jacket, and, *ipso facto*, is not a coat.

---

[1] Pursuant to 28 U.S.C. Rule 201, subsections (b) and (c) (1984), the court takes judicial notice of the fact that item 384.63, TSUS, other women's wearing apparel, includes knit wool sweaters, not ornamented, and which are valued at over $5 per pound. Although Item 384.63 is plaintiff's claimed classification for the imported jacket, Mr. Mule did not testify whether any of the exhibits were sweaters categorized under this item.

Finally, the court, as in all cases tried *de novo*, must determine which testimony it found most reliable and persuasive. In this case there was conflicting testimony regarding the characteristics and use of the imported merchandise. This court found the testimony of plaintiff's witnesses credible and convincing. It is noteworthy that all three of plaintiff's witnesses were highly experienced in the production or domestic sale of the imported jacket. To the contrary, defendant's witness, Mr. Tibor, while experienced in the production and sale of the jacket in Austria, had no actual knowledge of the U.S. market for the jacket or the expectations of the ultimate U.S. purchaser. Defendant's witness, Mr. Crowley, understood the policies of the Customs Service with respect to the jacket; however, he lacked sufficient knowledge of the use of the jacket, the manner in which it was marketed, or of the expectations of the ultimate purchaser of the jacket. In fact, he admitted that he had never seen this type of jacket worn in public.

B. *Interest Issue:*

Plaintiff has requested this court to direct the defendant to pay interest on excessive duties paid, and that such interest be calculated, pursuant to 28 U.S.C. § 2644 (1990), from the date of the filing of the summons to the date of the actual refund. Under that provision, a plaintiff in any civil action in the U.S. Court of International Trade is allowed interest on any monetary relief obtained by a judgment. The defendant concedes that the plaintiff is entitled to such interest.

Plaintiff also requests this court to direct the defendant to pay interest on excessive duties calculated, pursuant to 19 U.S.C. § 1520(d) (1991), from the date of payment of the excessive duties to the date of the filing of the summons. Under that provision, interest is allowed on "increased or additional duties." Recently, the Court of Appeals for the Federal Circuit held in *Kalan, Inc. v. U.S.*, 944 F.2d 847 (Fed. Cir. 1991), that excessive duties paid are not "increased or additional duties" within the meaning of 19 U.S.C. § 1520(d). Therefore, plaintiff is not entitled to interest on its refund of excessive duties under 19 U.S.C. § 1520(d).

## CONCLUSION

After an examination of the imported merchandise, exhibits introduced at trial, relevant tariff provisions and case law, and the testimony of record, it is the determination of the court that plaintiff has overcome the presumption of correctness that attaches to the government's classification and satisfied its burden of proof regarding its claimed classification. Therefore, the ladies wool knitted jackets are properly classified as "Other women's, girls', or infants' wearing apparel, not ornamented: Of wool: Knit: Other: Valued over $5 per pound: Other" under item 384.63, TSUS.

Plaintiff is entitled, under 28 U.S.C. § 2644, to interest on excessive duties paid, calculated from the date of the summons to the date of the actual refund.

Plaintiff is not entitled, under 19 U.S.C. § 1520(d), to interest on the refund of excessive duties, calculated from the date of their payment to the date of the filing of the summons.

Judgment will issue accordingly.